**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**MARÍA MURGUÍA**                                                    **PLAINTIFF**

**V.**                              **CASE NO. 5:20-CV-5221**

**CHARISSE CHILDERS, in her official
Capacity as Director of the Arkansas
Division of Workforce Services**                              **DEFENDANT**

<u>**MEMORANDUM OPINON AND ORDER**</u>

Before the Court are Plaintiff's Amended Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 35) and Brief in Support (Doc. 24).  Defendant filed a Response in Opposition (Doc. 38), and Plaintiff filed a Reply (Doc. 41).  The Court also held an evidentiary hearing on the Motion on March 15, 2021.  For the following reasons, Plaintiff's Motion (Doc. 35) is **DENIED**.

**I.  BACKGROUND**

This case arises out of a pending claim for unemployment benefits, or UI.[1] Defendant Charisse Childers is sued in her official capacity as the Director of the Arkansas Division of Workforce Services ("DWS" or "ADWS"), the state agency that administers UI.  Plaintiff María Murguía alleges that she was laid off from her job in housekeeping at Holiday Inn at the beginning of the COVID-19 pandemic and has waited almost a year to receive UI benefits.  Ms. Murguía brings claims under Title VI and the

---

[1] The Court understands that in response to the COVID-19 pandemic, Congress has funded various programs intended to supplement traditional unemployment benefits.  The Court will use "UI" as a blanket term that refers to all of these programs.

As explained below, *infra* p. 13, Ms. Murguía has now received certain UI benefits for the weeks of April 4 through July 18, 2020.  Certain other UI benefits to which she may be entitled for subsequent weeks have not been paid.

Procedural Due Process Clause of the Fourteenth Amendment.  Her Complaint also raised a third claim under state law, but Ms. Murguía dismissed that claim on the record, agreeing with the Court that sovereign immunity bars a claim in federal court for injunctive relief against a state official on the basis of state law.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984).

On March 15, 2021, the Court held a lengthy evidentiary hearing on Plaintiff's Motion.  Six witnesses testified: María Murguía, the plaintiff; Alejandra, her daughter; Kesha Rogers Kelly, the Assistant Director of UI; Raymond Michaud, who works in DWS's Fayetteville office; Eduardo Lemm, DWS's Regulatory Advisor for Targeted Populations; and Corina Parra, the UI Limited English Proficiency Coordinator.  The Court makes the following findings of fact for the purposes of this Motion based on the declarations and exhibits filed to the docket and the evidence presented at the hearing.

### A.  State and Federal Regulations

UI benefits are administered by the states, but the federal government provides a portion of the funding for state UI programs and imposes requirements on those programs as a condition of this funding. The Secretary of Labor is the federal official charged with oversight of state compliance with the federal requirements.  *See* 42 U.S.C. § 503. Pursuant to this authority, the Department of Labor ("DOL") has promulgated regulations that govern the federal-state UI program.  These guidelines include expectations for timeliness of processing and payment.  For example, in assessing state compliance with the requirement that UI payments be timely made, DOL requires that 93% of all initial payments be made within 35 days of the end of the first compensable week and that 87% of initial payments be made within 21 days.  *See* 20 C.F.R. § 640.5.

DOL has also promulgated regulations regarding language access for limited-English-proficient ("LEP") claimants that require state UI agencies to "take reasonable steps to ensure meaningful access to each limited English proficient individual served or encountered so that LEP individuals are effectively informed about and/or able to participate in the program."  29 C.F.R. § 38.9(b).  Such steps include "ensur[ing] that every program delivery avenue (e.g., electronic, in person, telephonic) conveys in the appropriate languages how an individual may effectively learn about, participate in, and/or access" UI benefits, 29 C.F.R. § 38.9(c), and "provid[ing] adequate notice to LEP individuals of the existence of interpretation and translation services and that these language assistance services are available free of charge."  29 C.F.R. § 38.9(e).

With regard to interpretation, the regulations specify that an accompanying adult may serve as an interpreter only "when the LEP individual specifically requests that the accompanying adult provide language assistance, the accompanying adult agrees to provide assistance, and reliance on that adult for such assistance is appropriate under the circumstances."   29 C.F.R. § 38.9(f)(2)(ii).  "When the [agency] permits the accompanying adult to provide such assistance, it must make and retain a record of the LEP individual's decision to use their own interpreter."  *Id*.  Additional guidance provided in an Unemployment Insurance Program Letter ("UIPL") instructs that "UI agency staff should be trained to identify language access barriers and provide affected claimants alternative access options."  Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 02-16, at 10 (Oct. 1. 2015) [hereinafter UIPL 02-16].

The DWS Operations Manual incorporates these requirements.  Regarding in-person interpretation, the manual provides that "ADWS staff must determine the primary

language spoken by the client by conversation, or use the 'I Speak' poster, targeting the most common languages spoken in Arkansas."  Doc. 35-3, p. 4.  The Manual provides the following regarding interpretation services for LEP claimants:

> LEP clients frequently report to a local office accompanied by relatives or friends who intend to serve as interpreters.  ADWS staff should be cautious in determining the ability of informal interpreters and should offer free LEP interpretation services to the clients.
>
> If the LEP client voluntarily chooses to provide their own interpreter, a DWS-ARK-599 form must be completed to allow ADWS to speak with the chosen interpreter about the claim.  This form must also be imaged to the claim and the service file must be documented.
>
> ADWS staff will not be required to obtain an interpreter for a LEP client when an informal interpreter is available, able, and a DWS-ARK-599 form was completed.

*Id*. at p. 6.

As to document translation, DOL regulations require that for commonly used languages, the state agency "must translate vital information in written materials into these languages and make the translations readily available in hard copy, upon request, or electronically such as on a Web site."  29 C.F.R. § 38.9(g)(1).  Vital information is defined as any "information, whether written, oral, or electronic, that is necessary for an individual to understand how to obtain any aid [or] necessary for an individual to obtain any aid . . . ."  29 C.F.R. § 38.4(ttt).  Pursuant to 29 C.F.R. § 38.9(g)(3), all communications containing vital information must contain a Babel notice, which is defined as a statement "in multiple languages informing the reader that the communication contains vital information, and explaining how to access language services to have the contents of the communication provided in other languages."  29 C.F.R. § 38.4(i).  Furthermore, "once [an agency] becomes aware of the non-English preferred language of an LEP [claimant],

the [agency] must convey vital information in that language."  29 C.F.R. § 38.9(h).  DOL also cautions that "[a]s state UI agencies move to almost exclusively website-driven services, there is an increased likelihood that LEP individuals will face barriers to accessing information and claims-related access in violation of Title VI and regulations . . . ."  UIPL 02-16 at p. 8.

Because the Spanish-speaking LEP population in Arkansas exceeds five percent, DWS is required to translate vital information into Spanish.  As indicated by the Limited English Proficiency Vital Documents Compliance Report, (Def. Exh. 4), many forms have been translated into Spanish, *see* p. 6, but other documents that might be considered vital information, like the Notice of Monetary Determination and the Notice of Agency Determination, have not.  *See* p. 11.  A claimant can be identified as Spanish-speaking in the DWS case management system, but Ms. Parra testified that this does not trigger forms in Spanish to be mailed to the claimant.  Translated forms are available on the DWS website, and some are available in hard copy from the DWS office. Most information that is sent by mail contains a Babel notice informing the reader, "Interpretation/Translation services available through your local office."  It does not direct a claimant to any website where a Spanish translation of the forms is available or provide a phone number to call. Ms. Parra testified that DWS does not have a telephonic interpretation service.

In addition to guidance regarding language access, DOL has issued instructions for state UI agencies in administering PUA, which was created by Congress to provide benefits for individuals who have been prevented from working by the COVID-19 pandemic but who do not qualify for traditional UI.  Pursuant to this guidance, an individual cannot be considered for PUA until it has been determined that she is not eligible for UI.

*See* Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 16-20, Attachment 1, at I-9 (Apr. 5, 2020).  States are instructed to "review regular [UI] claims that were denied as of January 27, 2020 forward and identify individuals who are potentially eligible" for PUA.  Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 16-20 Change 1, Attachment 1, at I-2 (Apr. 27, 2020).  The state agency must then "provide these individuals with appropriate written notification of their potential eligibility, including filing instructions."  *Id*.

### B. DWS Claim Process

Ms. Kelly testified that in February 2020, there were approximately 1,000 UI claims to be adjudicated by DWS.  When the pandemic began, the number of claims for UI benefits soared to more than 60,000, and as of March 15, 2021, DWS had approximately 23,000 claims awaiting adjudication.  A claimant may come in person to a DWS office to apply for UI.  As part of its COVID-19 precautions, DWS permits only one party inside the lobby at a time.  The claimant submits any documents at a front intake station but is not present when those documents are entered into the computer.

When a UI claim is opened, DWS sends notice to the claimant's last employer and any other base period employers.  By statute, such employers have 10 and 15 days respectively to respond to the notice, and after that they may be deemed to have waived the right to respond.  *See* Ark. Code Ann. §§ 11-10-505(a)(2)(A) & 11-10-521(b)(2)(A).  However, Ms. Kelly testified that if information comes in after the deadline but before the claim has been processed, DWS is permitted to consider the information that is received.

If there is a dispute regarding the reason for separation or an indication that the reason for separation may be disqualifying, the claim goes to adjudication.  Adjudication

is a fact-finding process but does not involve a hearing—the DWS adjudicator gathers information from the claimant and the employer and then issues an initial decision about whether or not the claimant qualifies for benefits.  If the claimant is determined to be ineligible, he or she has the right to seek an appeal from the Appeal Tribunal.  Based on the information presented, the Appeal Tribunal may then refer a claim back to DWS for further investigation and review.  Ms. Kelly testified that there is no system for prioritizing claims in which DWS has made an error—such claims rejoin the line for adjudication. Once a claimant has been found ineligible, she must work another 30 days in a qualifying position before she is eligible to apply for UI benefits again.

### C.  María Murguía

Plaintiff María Murguía was born in Mexico and is a legal permanent resident of the United States.  Through a translator, Ms. Murguía testified at the hearing that she does not speak any English.  She also testified that she can read and write "very little" in Spanish.  Ms. Murguía worked for Molly Maid of Northwest Arkansas until November 2019, when she left Molly Maid to begin a job at Holiday Inn in Bentonville.  Formally, her employer was Interstate Management Company, LLC.  In March 2020, occupancy rates at Holiday Inn dropped because of the COVID-19 pandemic, and Ms. Murguía was laid off.  On April 2, 2020, Ms. Murguía and her daughter, Alejandra, went to the DWS office in Fayetteville.  Alejandra completed a paper application for unemployment benefits in English on her mother's behalf and listed Holiday Inn as Ms. Murguía's last employer. When they reached the front of the line, they handed the paper application to the staff member at the front desk, who also made copies of Ms. Murguía's permanent resident card.  Alejandra acted as an interpreter between her mother and the DWS employee

throughout that interaction.  Alejandra testified that no one offered interpreter services, nor were there signs offering such services, but she would have accepted any services that were offered because "they could explain it way better than [Alejandra] could."

Several days later, a DWS staff member entered into the computer the information from Ms. Murguía's application.  The wages Ms. Murguía earned at Holiday Inn, however, did not appear because, as it was later discovered, the company recorded Ms. Murguía's social security number incorrectly.  Ms. Kelly testified that the proper procedure would have been to contact Ms. Murguía at that time to provide paystubs to corroborate her employment.  Here, the Court concludes that the staff member likely saw that Ms. Murguía's most recent earned wages were from Molly Maid and wrongly listed that company as the last employer on the electronic application.  This error by DWS set the stage for a cascade of additional errors that would soon follow.

DWS generated a Notice of Monetary Determination on the basis of Ms. Murguía's wage history with Molly Maid, which was mailed to her on April 9, 2020.  A notice was also sent to Molly Maid as Ms. Murguía's (incorrectly listed) last employer.  In response, Molly Maid disputed that Ms. Murguía had been laid off and provided evidence that she quit her job at Molly Maid in November 2019.  Ms. Murguía also disputed the agency's monetary determination.  On May 7, 2020, she faxed a letter to the agency indicating that she was "laid off from Holiday Inn Hotel due to Covid-19," that she "do[es] not work for Molly Maid of Northwest Arkansas" and that she "was not laid off from Mollymaid [sic] of Northwest Arkansas." (Doc. 38-2, p. 20).  Ms. Kelly testified that because of the enormous influx of documents and the increase of claimants, Ms. Murguía's letter was not added to her file until June, further compounding DWS's initial error.  In the meantime, a DWS staff

member reviewed Ms. Murguía's application and the materials provided by Molly Maid in opposition and determined that Ms. Murguía was not eligible for UI for quitting her job with Molly Maid.

Ms. Murguía was informed of this decision and her right to appeal by letter. Alejandra translated the letter for Ms. Murguía to the best of her ability.  Ms. Murguía then submitted a petition for appeal on June 17, 2020.  Before the date of the appeal hearing, however, Ms. Murguía sent a typed letter withdrawing her appeal.  In the letter, Ms. Murguía indicated that she did not understand why Molly Maid was listed as her employer and not Holiday Inn but stated that since Holiday Inn is "not the employer on this appeal, it does not make sense to move forward with the appeal as it is set up."  (Doc. 38-3, p. 2).  Consequently, the appeal was dismissed at the time of the hearing on July 28, 2020.

About a month later, on August 25, Ms. Murguía and Alejandra visited the DWS Fayetteville office again to request that her claim for UI benefits be considered based on her employment with Holiday Inn.  They spoke with Mr. Michaud at the intake point and asked why DWS had the wrong information as to Ms. Murguía's last employer.  During the exchange, Alejandra testified that she and Ms. Murguía were speaking in Spanish as Alejandra translated the exchange with Mr. Michaud.  Mr. Michaud did not offer Ms. Murguía free translation services, though he acknowledged that the proper procedure would have been to do so had he identified her as having limited proficiency in English. Mr. Michaud told Ms. Murguía to provide DWS with paystubs from Holiday Inn, but when Ms. Murguía and Alejandra returned the next day with the paystubs, Mr. Michaud refused to take them and add them to her file, though he acknowledged in his testimony that the proper procedure would have been to do so.  Alejandra testified that Mr. Michaud wrote

down "30 days of work" on a slip of paper, indicating that Ms. Murguía had already been found ineligible and would need 30 days of new work before she would be eligible for UI again.  *See* Pl. Exh. 9.  He did not mention that Ms. Murguía might be eligible for PUA benefits.  Both women felt that Mr. Michaud was very rude and angry, which caused Ms. Murguía to conclude that he was racist towards Mexicans.

Mr. Michaud testified that he had no recollection of this contact with Ms. Murguía, and DWS contends that there is no evidence of Ms. Murguía having visited the office on August 25 and 26.  On August 26, however, Mr. Michaud ran a check to verify Ms. Murguía's immigration status in a federal database called SAVE.  *See* Doc. 38-2, p. 37. Mr. Michaud and DWS suggest that the timing of the SAVE report is merely a coincidence. The Court expressly finds otherwise and credits Ms. Murguía and Alejandra's accounts of their visits to the DWS office on August 25 and 26.

About a month later, on September 23, an attorney from Legal Aid contacted Mr. Lemm, seeking help with Ms. Murguía's situation.  Mr. Lemm forwarded the email to Ms. Parra.  Alejandra emailed the paystubs from Holiday Inn to Ms. Parra that same day, and DWS promptly issued a new Notice of Monetary Determination reflecting those wages, *see* Doc. 8-2, p. 31, and a Notice of Amended Determination stating that the June 9 decision "was issued in error since this was not the claimant's correct last work."  (Doc. 38-2, p. 35).  That same day, Ms. Parra sent Mr. Lemm an email describing how Ms. Murguía's situation had been complicated by her decision to withdraw her appeal.  Ms. Murguía indicated that she was advised to withdraw her appeal by the Economic Justice Staff Attorney at Legal Aid of Arkansas, referred to as EJSALAA, but could not explain why.  *See* Pl. Exh 10, p. 12.

The process began anew, with notice going out to Interstate as Ms. Murguía's last employer.  *See* Doc. 38-2, p. 38.  Interstate never replied to oppose Ms. Murguía's claim on the basis of her most recent employment.  However, Equifax responded based on a previous job Ms. Murguía held with Interstate between July 2016 and September 2017.  *See* Doc. 38-2, p. 39.  Though this was actually non-responsive to DWS's Notice to Last Employer sent on September 25, 2020, *see* Doc. 38-2, p. 38, Ms. Kelly testified that it was sufficient to get Ms. Murguía's claim sent to adjudication again when DWS processed Equifax's response on October 29, 2020.

Ms. Murguía spoke with Ms. Parra again in December.  In her declaration, Ms. Murguía alleged that during this conversation, Ms. Parra questioned her about the immigration status of her former co-workers at Holiday Inn and implied that Ms. Murguía's case would be closed if she refused to answer those questions.  *See* Doc. 35-1, ¶ 34.  In her own declaration, Ms. Parra asserted that this was false and that Ms. Murguía actually volunteered information about the immigration status of her former supervisor during this conversation and that Ms. Parra took no action in response to this allegation.  *See* Doc. 38-5, ¶ 9.  During the hearing, Ms. Murguía testified that Ms. Parra "asked if [Ms. Murguía's] coworkers had a good social."  Her attorney then asked if she "t[ook] her meaning to be that she was asking you about their immigration status," to which Ms. Murguía responded, "Yes."  When asked "How did that conversation end?" Ms. Murguía did not mention Ms. Parra's alleged threat to close her case.  Ms. Parra's testimony followed the account that is contained in her declaration.  The Court finds Ms. Parra's account of the exchange more credible and concludes that no such threats or coercion occurred.

Throughout this process, all substantive written correspondence between DWS and Ms. Murguía has been in English.  The Notice of Monetary Determination contains only the Babel notice.  *See* Doc. 38-2, pp. 9, 31.  Ms. Murguía's handwritten response was in English.  *See id.* at p. 20.  The initial Notice of Agency Determination also contains the Babel notice at the bottom and includes a paragraph in the body of the letter in Spanish instructing that a reader in need of assistance should report to the local office in person.  *See id.* at p. 24.  The same is true of the amended determination that was sent in September.  *See id.* at p. 35.  The Notice of Telephone Hearing for Ms. Murguía's appeal, with instructions on how to participate in the hearing, is written only in English. *See id.* at p. 27.  Ms. Murguía's typewritten letter withdrawing her appeal was in English. *See* Doc. 38-3, p. 2.  The decision of the appeal tribunal is also written only in English. *See* Doc. 38-2 at p. 28.  Neither the agency determination denying UI eligibility nor the appeal tribunal's decision contain information about applying for PUA.

Ms. Murguía filed her Amended Motion for Temporary Restraining Order and Preliminary Injunction on February 25, 2021.  The Amended Motion asks the Court to order DWS to make an immediate eligibility determination on Ms. Murguía's pending UI application and, if she is eligible, pay her benefits back to when she was laid off in March. If she is not eligible, Ms. Murguía asks the Court to expedite consideration of an application for PUA, with benefits to be paid back to the same date.  Ms. Murguía also asks the Court to order that any appeals be expedited as well.  Next, Ms. Murguía requests a restraining order and preliminary injunction requiring DWS to take a variety of steps to ensure meaningful language access, including posting visible signs about the availability of Spanish-language services, sending written notices with the substantive

content in Spanish, and providing translation services by phone and not only in person, with taglines in Spanish included on documents to inform claimants of this service. Finally, Ms. Murguía asks the Court to order DWS to vacate or reconsider any decision that would foreclose her eligibility before the June 10 determination involving Molly Maid. In support of her Motion, Ms. Murguía argues that she has a likelihood of success on the merits of both her Title VI and procedural due process claims and that she suffers ongoing irreparable harm from the delay in her benefits because she cannot afford necessities for herself and her minor son.

After the hearing, the Court was notified that Ms. Murguía's claim for UI was approved for the weeks of April 4 through July 18, 2020, but she will need to file separate applications to seek benefits for subsequent weeks in which she may be eligible. *See* Doc. 45-1. Ms. Murguía asserts that this update does not moot many of her claims for relief. She asks the Court to expedite processing of the additional applications and grant the requested relief related to language access. *See* Doc. 46. Because Ms. Murguía could still be entitled to a preliminary injunction regarding language access and/or expedited consideration for other unemployment benefit programs, the Court takes up the merits of her claims below.

After laying out the applicable legal standard, the Court discusses Defendant's threshold defenses. Proceeding to the merits of each of Ms. Murguía's claims, the Court first assesses whether Ms. Murguía has demonstrated a likelihood of success on the merits of her Title VI claim, considering both the *McDonnell Douglas* balancing test and deliberate indifference as possible standards for intentional discrimination. Though the Court finds that Ms. Murguía has made at least a prima facie showing of intentional

discrimination for which DWS has failed to offer a satisfactory nondiscriminatory explanation, the Court concludes that Ms. Murguía has not demonstrated an irreparable harm from the alleged Title VI violation for which emergency relief is appropriate.   Then, the Court considers Ms. Murguía's likelihood of success on the merits of her due process claim.   Again, the Court concludes that there is possible merit to Ms. Murguía's allegations, but that emergency relief is nevertheless inappropriate.

## II.  LEGAL STANDARD

The Court must consider the *Dataphase* factors when determining whether to grant a motion for a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest.  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.*, 640 F.2d 109, 113 (8th Cir. 1981)).  Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of proving that the balance of the equities is in its favor.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  "The burden on the movant is heavy, in particular where granting the preliminary injunction will give the movant substantially the relief it would obtain after a trial on the merits."  *Smithfield Packaged Meat Sales Corp. v. Dietz & Watson, Inc.*, 452 F. Supp. 3d 843, 853 (S.D. Iowa 2020) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)) (cleaned up).

"While no single factor is determinative, the probability of success factor is the most significant."  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotation marks and citations omitted).  "To that end, 'the absence of a likelihood of

success on the merits strongly suggests that preliminary injunctive relief should be denied.'" *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013) (quoting *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009)).  Additionally, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.  When there is an adequate remedy at law, a preliminary injunction is not appropriate." *Watkins*, 346 F.3d at 844.  "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).  Finally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 465 U.S. 305, 312 (1982)).

## III.  DISCUSSION

Defendant's briefing on the Motion begins by invoking sovereign immunity, standing doctrine, and res judicata, but without acknowledging the Court's previous rulings on these issues.  For example, Defendant's sovereign immunity arguments were denied for the reasons explained in the Court's Memorandum Opinion and Order Denying Motion to Dismiss ("March 2 Order") (Doc. 37).  There, the Court held that Ms. Murguía's claim under the Fourteenth Amendment falls within the *Ex parte Young* exception to state

sovereign immunity.  Defendant offers no reason for the Court to revisit its ruling on the issue of sovereign immunity, and the Court declines to do so.[2]

Defendant's argument as to standing is also unpersuasive.  Defendant argues that Ms. Murguía lacks standing to pursue her Fourteenth Amendment claim because the threat of injury is too speculative.  The Court disagrees.  The Complaint and the instant Motion make clear that Ms. Murguía's alleged harm is the ongoing delay in receiving an accurate adjudication of her claim, which has made her unable to provide for her family's basic needs.  The Court concludes that Ms. Murguía has standing to pursue her claims.

Finally, Defendant's invocation of res judicata is simply an effort to renew under another name the arguments about administrative exhaustion that the Court rejected in its March 2 Order.  The purpose of the appeal set in July 2020 would have been to determine whether DWS made a mistake in identifying Molly Maid as Ms. Murguía's last employer.  That is not a question currently before this Court.  Nor could the issues before this Court have been resolved by that appeal because many of the relevant facts occurred in the months since Ms. Murguía withdrew her administrative appeal.  Thus, the Court rejects these threshold defenses and proceeds to the merits of Ms. Murguía's claims.

### A.  Title VI

Title VI provides a private right of action for claims of intentional discrimination only, not for disparate impact.  *See Alexander v. Sandoval*, 532 U.S. 275 (2001).  Ms. Murguía has two theories of intentional discrimination in this case.  First, she asserts that

---

[2] Defendant also invokes *Daniels v. Williams*, 474 U.S. 327 (1986), for the proposition that a procedural due process claim requires evidence of intentional misconduct by the government actor.  However, since Ms. Murguía's constitutional claim is brought pursuant to *Ex parte Young* and seeks only prospective injunctive relief, any reliance on *Daniels*, which involved a suit for damages pursuant to 42 U.S.C. § 1983, is wholly misplaced.

where there is no direct evidence of intentional discrimination, the Court may apply the *McDonnell Douglas* burden-shifting analysis more commonly used in the context of Title VII. *See Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 355 (8th Cir. 2020) (applying *McDonnell Douglas* in analyzing a Title VI claim for discrimination on the basis of race). Defendant does not dispute that this framework is also applicable to Title VI claims. In the alternative, Ms. Murguía argues that the Court should hold that a showing of deliberate indifference may also support a finding of intentional discrimination under Title VI. As the Court previously noted in its March 2 Order, this is a more novel theory of liability that has not been applied to analogous facts under Title VI in this circuit. Defendant's briefing does not address this aspect of Ms. Murguía's claim.

Below, the Court will address each of these theories of liability in turn. First, the Court finds that Ms. Murguía has made a prima facie case for intentional discrimination, and the state has failed at this juncture to offer a persuasive nondiscriminatory answer. Nevertheless, the Court finds that there has not been a showing of ongoing irreparable harm linked to this intentional discrimination. As to deliberate indifference, the Court reaches the same conclusion—even if it were to adopt the deliberate indifference standard for demonstrating intentional discrimination under Title VI, the evidence presented thus far does not show irreparable harm arising from DWS's deliberate indifference to Ms. Murguía's need for language access services, and the requested emergency injunctive relief is not an appropriate remedy.

### 1. *McDonnell Douglas* Framework

"To establish a prima facie case of discrimination under Title VI, the plaintiff must show (1) that the defendant is receiving federal funds, (2) that the plaintiff was

discriminated against, and (3) the plaintiff's race, color, or national origin was the motive for the discriminatory conduct." *Scarlett v. Sch. of Ozarks, Inc.*, 780 F. Supp. 2d 924, 933–34 (W.D. Mo. 2011). "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its decision." *Rowles*, 983 F.3d at 355. "If the defendant proffers such a reason, the burden shifts back to the plaintiff to show that the proffered reason was mere pretext for discrimination." *Id*.

The Court first considers whether the fact that Ms. Murguía speaks Spanish and has limited proficiency in English may appropriately be considered a proxy for Ms. Murguía's identity as a Mexican-born immigrant and concludes that it may.[3]  In *Mumid*, the Eighth Circuit held that since the challenged policy referred to English-language-learners, it did not "facially discriminate based on national origin," and was not *by itself* proof of a Title VI violation.  618 F.3d at 795.  The court did not foreclose the possibility that additional evidence might link the ELL policy to intentional discrimination on the basis of national origin.  Here, the Court is persuaded that the link between Ms. Murguía's limited proficiency in English and her national origin is plausibly alleged.

---

[3] In her Response Brief, Defendant quotes (without attribution) the Eighth Circuit's observation that "[w]hile Title VI prohibits discrimination on the basis of national origin, language and national origin are not interchangeable."  (Doc. 38, p. 20).  *See Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010).  Defendant does not follow this observation with any argument related to the facts before the Court.  Additionally, the only binding precedent Defendant cites in support of this proposition is not factually similar enough to Ms. Murguía's claims to have any relevance.  *See Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1048 (8th Cir. 2003) (observing that the defendant's request that a co-worker "translate" an email from the plaintiff was a "race-neutral comment[]" and that simply "criticizing a foreign employee's facility with the English language" was insufficient to constitute "discrimination against a particular race or national origin" in violation of Title VII).

Ms. Murguía makes many allegations that she argues together establish a prima facie case of discrimination on the basis of national origin.  The Court finds, however, that some of those allegations are not supported by the evidence presented so far.  For example, the Court does not credit Ms. Murguía's account in her declaration of her December 2020 conversation with Ms. Parra.  *See* Doc. 35-1, ¶ 34.  The evidence also does not bear out Ms. Murguía's allegation that DWS improperly waited more than 10 days for Holiday Inn to respond to its request for information while it investigated Ms. Murguía's immigration status or Holiday Inn's hiring practices.  Ms. Kelly testified that Ms. Murguía's claim was flagged for adjudication based on information from Equifax pertaining to an earlier time when Ms. Murguía worked for Interstate.  She also testified that once a claim is ready for adjudication, DWS may take into consideration any information from the employer, even if it was received more than 10 days after notice was sent, and that as of March 15, Ms. Murguía's claim was still in line awaiting adjudication. None of the evidence suggests a discriminatory reason for DWS's delay in adjudicating Ms. Murguía's claim as to Holiday Inn.

The Court does find credible and persuasive, however, Ms. Murguía's allegations regarding Mr. Michaud's failure to offer her interpretation services despite the obvious need to do so, his refusal to accept the paystubs she brought, and the fact that he ran a search to verify Ms. Murguía's immigration status on August 26, 2020.  While the Court does not give particular weight to whether Mr. Michaud was rude to Ms. Murguía and Alejandra, the Court credits their accounts of their visit to DWS.  In particular, the fact that Mr. Michaud ran a check on Ms. Murguía's immigration status—while at the same time denying that he refused to process her claim with the Holiday Inn check stubs—makes a

discriminatory motive more plausible.  The Court concludes that together, this evidence chins the bar to establish a prima facie case that Ms. Murguía was denied access to UI benefits, which are funded in part by federal money, on the basis of her national origin as a Mexican-born immigrant.

Second, the Court is not persuaded that Defendant has met its burden to establish a legitimate reason for these actions.  The Court credits DWS's general assertion that it is "processing claims in a first-in, first-out as fast as we can" and that "there are thousands of Arkansans currently trying to navigate the system, just like she is, and that they are all being treated the same."  But the existence of those severe circumstances does not rebut Ms. Murguía's specific allegations of discrimination.  Ms. Kelly testified that immigration status is generally verified at the very beginning of the claim process, that Ms. Murguía provided proof of her status as a lawful permanent resident on or before April 11, 2020, and that DWS never flagged any issues with Ms. Murguía's immigration status.  Ms. Kelly suggested that DWS might have been behind in running SAVE searches, but she did not have any documentation to show that DWS was 4 or 5 months behind, and Mr. Michaud testified that he was not aware of any backlog in the processing of SAVE verification requests.  Additionally, in August 2020, Ms. Murguía did not have a pending application for UI benefits that might require verification of her immigration status.  Her initial claim had been denied a month earlier when her appeal was closed, and Mr. Michaud did not assist her in reopening her case or filing a new claim regarding her employment at Holiday Inn.  Instead, he told her that she would need to work 30 days at a new job before she could reapply for benefits.  Thus, Defendant has failed to offer a nondiscriminatory reason for Mr. Michaud refusing to assist Ms. Murguía with her claim as to Holiday Inn and

running a federal check on her immigration status, neither of which conformed with DWS policy, and Ms. Murguía has established at least some likelihood of success on her Title VI claim.

Having considered the relative likelihood of success on the merits of Ms. Murguía's claim using the *McDonnell Douglas* test as the standard for intentional discrimination, the Court turns to the question of whether Ms. Murguía will suffer irreparable harm absent a preliminary injunction.  In her affidavit accompanying her Motion, Ms. Murguía attests that without UI benefits, she cannot pay the rent or other bills, buy enough food for her family, or provide clothing and shoes for her son.  The harm here is not purely economic—courts have recognized that an individual suffers irreparable harm when she cannot provide for her basic needs.  *See, e.g.*, *Swanson v. Greater Metro. Hotel Emps.-Emps. Health & Welfare Fund*, 2002 WL 1402536, at *3 (D. Minn. June 28, 2002) (holding that the plaintiff had made "a compelling showing of irreparable harm" when terminating the plaintiff's insurance benefits would have left her with "virtually nothing" for "food, clothing and other basic needs" and "with the uncompromising choice of foregoing either essential items of daily living or necessary medication").  The harm specifically attributable to DWS's allegedly discriminatory actions, however, is not imminent and can be redressed with monetary damages.

First, the Court reiterates that the only plausible evidence of intentional discrimination Ms. Murguía has presented so far relates specifically to Mr. Michaud's behavior on August 25 and 26, 2020.  His refusal to assist Ms. Murguía, which is plausibly alleged to be based on Ms. Murguía's national origin, meant that she was unable to file a claim for UI benefits in August.  Fortunately, Legal Aid formally intervened on Ms.

Murguía's behalf on September 23 and submitted the requested paystubs.  The Court concludes that Mr. Michaud's alleged behavior resulted in a four-week delay in the processing of Ms. Murguía's application.  But none of the evidence presented so far suggests that there is any ongoing consequence of Mr. Michaud's behavior in August. Ms. Kelly was clear in her testimony that UI applications are being adjudicated in the order they are identified.  There is no evidence that the processing of Ms. Murguía's application will be further delayed because of the intentional discrimination of any DWS employee. The Court is sympathetic to the hardship that Ms. Murguía has suffered during this entire process, and the evidence suggests that Mr. Michaud's failure to accept her paystubs from Holiday Inn in August prolonged the delay in adjudicating Ms. Murguía's case. However, this is not the type of harm for which a preliminary injunction is appropriate. Should Ms. Murguía prevail on her Title VI claim at the merits phase, she will be entitled to compensatory damages, and the Court concludes that this is an adequate remedy for harm that has already occurred and is not ongoing or likely to reoccur in the near future.

## 2.  Deliberate Indifference

Ms. Murguía argues that a showing of deliberate indifference would also be appropriate evidence of intentional discrimination under Title VI.  Defendant did not make any argument about the appropriateness of this standard in her briefing or at the hearing. Below, the Court assumes without deciding that the deliberate indifference standard is an appropriate test for intentional discrimination in this context and concludes that Ms. Murguía would not be entitled to emergency relief on this theory even if it were adopted.

The deliberate indifference standard allows a court to infer intentional discrimination "from a defendant's deliberate indifference to the strong likelihood that

pursuit of its questioned policies will likely result in a violation of federally protected rights."

*Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).  The Court agrees with Ms. Murguía that DWS failed to follow state and federal language access regulations in her case.  At the hearing, Defendant did not dispute that Ms. Murguía was not offered interpretation services on either of her visits to the Fayetteville DWS office, nor is there a 599 form in Ms. Murguía's file permitting DWS to interact with Alejandra as Ms. Murguía's informal interpreter.  Mr. Michaud acknowledged during his testimony that he had an obligation to inform Ms. Murguía of the availability of free translation services if he identified her as an LEP claimant.  The Court does not find it credible that a DWS employee who spoke to Alejandra in English, saw her turn and converse with Ms. Murguía in Spanish and then turn back and speak again to the employee in English, would not have understood that Alejandra was acting as an informal interpreter and that the staff member should offer formal services.  Though Defendant emphasizes that Ms. Murguía never requested translation services, DOL guidance clearly puts the responsibility on the agency, not the claimant, to identify language barriers and provide access options.  And while Defendant presented photos of signs and materials in Spanish provided at the DWS office in Fayetteville, none of the photos depicted anything communicating the availability of free interpretation services.  Thus, Ms. Murguía has demonstrated that the DWS likely violated DOL and internal language access policies by not offering or posting formal interpretation services on either of her visits.

The Court also agrees that DWS's written communication with Ms. Murguía may not satisfy federal requirements.  For example, the Babel notice contained on some of the forms Ms. Murguía received in the mail may not provide all the information required by

the federal regulations.[4]  The Notice of Telephone Hearing, containing instructions about Ms. Murguía's appeal hearing, and the Decision of Hearing Officer, which includes appeal instructions, likely fit the definition of vital information but contain no Spanish whatsoever. Ms. Parra testified that only the UI handbook, application, and weekly claim form are available in hard copy in Spanish at DWS offices.  Many translated forms are available only through the website, and none of the mail Ms. Murguía received in English directed her to Spanish versions of those forms online, nor is there a way for her to receive assistance by phone.  Based on the evidence presented, the Court finds it plausible that DWS may not be in full compliance with DOL requirements regarding vital information.[5]

But while the Court agrees that DWS has not adhered to language access requirements, it also finds that Ms. Murguía has not presented sufficient evidence at this juncture to suggest that the allegedly erroneous deprivation of her right to UI benefits was due to DWS's failure to adhere to the language access requirements and that full

---

[4] The Court also notes that the Babel notice that appears on some of the documents Ms. Murguía received from DWS is not the same as the Babel notice Insert specified in the Limited English Proficiency Vital Documents Compliance Report.  *See* Def. Exh. 4, p. 7.

[5] Evidence was also presented at the hearing that DWS may not be complying with DOL guidance regarding the administration of PUA.  Plaintiff's counsel asked Ms. Kelly about her understanding of DWS's obligation to inform claimants about their potential eligibility for PUA.  Ms. Kelly testified that her understanding was that DWS could "inform via social media, our website, press release, things to that nature" and that DWS "didn't need to inform [an] individual" personally of his or her potential eligibility.  However, when presented with UIPL 16-20, she acknowledged that her understanding was inconsistent with the DOL's guidance.  *See* Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 16-20 Change 1, Attachment 1, at I-2 (Apr. 27, 2020).  Ms. Murguía did not receive any information about PUA when her UI claim was initially denied. Based on this evidence, the Court could conclude that DWS is not in compliance with federal guidelines for administering PUA.  However, Ms. Murguía was not injured by this possible noncompliance because she has been granted an initial phase of UI benefits, and DWS has indicated that she can now be considered for additional benefits.  *See* Doc. 45-1, p. 1.

compliance with the applicable regulations in her case would have prevented the delay she has endured.  Ms. Murguía insists that she wrote down the correct last employer on her initial application and that the error was introduced by the DWS staff member who input the information into the computer, and the Court finds that account credible.  But this means that the initial error resulted not from Ms. Murguía's misunderstanding of a form that was not provided to her Spanish but from a clerical error.  When she tried to correct this error in response to the Notice of Monetary Determination, Ms. Murguía did not assert that she did not understand the problem or know how to correct it.  In fact, she was able to fax a letter to DWS informing them of the issue.  Similarly, Ms. Murguía does not argue that she failed to pursue her appeal in July because she did not understand the requirements or because she did not know interpretive services were available.  Rather, she misunderstood the best way to remedy the error—a mistake that was due to a lack of knowledge about the UI process but not a language barrier, especially since Ms. Murguía was likely advised in this step by counsel.  In August when Mr. Michaud refused to accept her paystubs, Ms. Murguía does not allege that this was because they did not understand each other but rather because of his intentional discrimination against her as a Mexican immigrant.  Thus, even if the Court accepts DWS's deliberate indifference to the regulations as evidence of intentional discrimination, Ms. Murguía has not shown a causal link between this discriminatory conduct and her inability to access UI benefits.  Thus, Ms. Murguía has not shown a likelihood of success on the merits of this claim.[6]

---

[6] During the hearing, both Ms. Kelly and Ms. Parra testified that a claimant can be flagged as needing Spanish-language services in DWS's case management system.  Ms. Kelly testified when she reviewed Ms. Murguía's file, Ms. Murguía had not been flagged as needing such services.  The Court expects that at this point, if Ms. Murguía or her counsel have requested that her file be so flagged, DWS has done so and is following the

## B.  Procedural Due Process

Next, the Court turns to the merits of Ms. Murguía's procedural due process claim. To establish a procedural due process violation, the plaintiff must show that "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest."  *Stevenson v. Blytheville Sch. Dist.*, 800 F.3d 955, 966 (8th Cir. 2015).   Three factors are appropriate for consideration when determining whether the requirements of the Due Process Clause were satisfied or whether more process is due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Ms. Murguía asserts that she has a property interest in UI benefits and that she has been constructively deprived of that interest by Defendant's unreasonable delay in adjudicating her claim for benefits.  Defendant does not dispute that Ms. Murguía has a protected interest in UI benefits and acknowledges that a substantial and unreasonable delay may constitute a deprivation.  Based on the evidence before it, the Court concludes that DWS made multiple errors in Ms. Murguía's case.  First, it is likely that a DSW

---

applicable procedures for communicating with Ms. Murguía in light of this designation. However, as discussed above, since the evidence presented thus far does not establish a likelihood that Ms. Murguía's alleged harm is due to the inadequacy of DWS's accommodations for LEP claimants, the Court finds it inappropriate at this juncture to order DWS to modify its language access policies and procedures.

employee entered the incorrect last employer when inputting Ms. Murguía's form rather than following up with her when wages from Holiday Inn did not appear in the computer system.  Second, in adjudicating Ms. Murguía's claim, DWS failed to consider her note in response to the Notice of Monetary Determination informing DWS that it had made an error as to her last employer.  As a result, Ms. Murguía's initial claim was adjudicated based on the incorrect last employer and she was denied benefits.

The Court cannot find that Ms. Murguía's procedural due process rights were violated by these errors, however, because there was an opportunity for Ms. Murguía to appeal the initial adjudication.  The testimony before the Court suggests that if Ms. Murguía had appeared at the hearing that she initially requested before the Appeal Tribunal, she would have had the opportunity to point out the error and her claim would have been remanded to DWS for adjudication with the correct last employer.  It was Ms. Murguía's own decision, likely on the advice of counsel, to withdraw her request for a hearing with the intention of opening a new claim with the correct last employer, and by doing so, she stepped out of her place in line.

DWS's next error occurred when Ms. Murguía visited the DWS office in August and was directed to return with paystubs to prove her employment at Holiday Inn.  The Court credits Ms. Murguía's account of her experience at DWS's Fayetteville office on those dates, in particular Mr. Michaud's failure to take the documents she offered and flag her case for further review.  Both Ms. Kelly and Mr. Michaud testified that DWS procedure would have been for Mr. Michaud to take and scan any documents Ms. Murguía provided. This error resulted in a four-week delay—until Legal Aid intervened on Ms. Murguía's behalf on September 23, 2020, to have the paystubs added to Ms. Murguía's file and her

initial eligibility determination withdrawn.  While this was no doubt a hardship for Ms. Murguía, it was not a delay of unconstitutional proportions.

The delay that is most troublesome to the Court is the delay that began on September 23, 2020, when DWS rescinded its previous determination and reopened Ms. Murguía's claim.  Six months passed before Ms. Murguía's claim was adjudicated, and she has only recently been approved for benefits through July 18, 2020.  Now it appears that she must complete yet additional applications and await further determinations on her eligibility for benefits in subsequent weeks.  Considering that UI provides subsistence benefits to replace lost income, and claimants are likely in urgent need of those benefits, this delay puts a severe burden on applicants awaiting adjudication of their claims.

The Court recognizes that the COVID-19 pandemic has placed enormous demands on the UI system, but a full year has now elapsed since the pandemic began. The Court can imagine that the state government might have an obligation under the Due Process Clause to shift resources in order to respond adequately to the magnitude of the need.  Ms. Kelly testified there were seven vacancies in the adjudication department as of March 15, 2021. She testified that DWS has made requests for assistance from other departments and even from the National Guard, but as of the hearing, DWS continued to be understaffed.  Thus, the Court will not rule out the possibility that a lengthy delay in the delivery of subsistence benefits that, under normal circumstances, DOL expects to be delivered within 35 days of a layoff, may constitute a delay of constitutional proportions, even in the context of the COVID-19 pandemic.  *See Islam v. Cuomo*, 475 F. Supp. 3d 144 (E.D.N.Y. 2020) (holding that plaintiffs demonstrated a likelihood of success on the merits of their claim that a review process that took approximately three months violated

28

42 U.S.C. § 503(a)(1), which requires that unemployment benefits be paid "when due," and granting a preliminary injunction that required the state agency to designate, on-board, and train additional staff within seven days to deal with a backlog of appeals).

Despite the potentially unconstitutional nature of this delay, however, the Court concludes that the requested relief—expediting the consideration of Ms. Murguía's claim—is not in the public interest.   The Court disagrees with Ms. Murguía's characterization that "[s]he is not jumping the line in any sense.   If anything, owing to DWS's actions, the line has been jumping her."  (Doc. 24, p. 39).   Even though DWS has made multiple mistakes in handling Ms. Murguía's claim, those errors are not the reason that Ms. Murguía's claim is still pending today.   The evidence presented suggests that if she had taken her appeal in July, her claim would have been resolved several months ago.   The delay since September is not due to anything specific to Ms. Murguía's claim. Rather, it is the result of an overburdened system to which the state has not committed sufficient resources to meet the public need.   Moving Ms. Murguía to the front of the line would assuage her constitutional violation, should one be found, but simultaneously deepen the harm suffered by every other person who has been waiting just as long. Therefore, the Court concludes that the balance of the equities does not favor an injunction expediting consideration of Ms. Murguía's claims for additional UI benefits.

Additionally, Ms. Murguía has recently received approximately $13,000 in benefits. As discussed above, the deprivation of subsistence benefits can be an irreparable harm, but the payment of this initial phase of benefits likely alleviates Ms. Murguía's most severe harm, and the risk of irreparable harm from additional delay is not certain and imminent at this point.

## IV.  CONCLUSION

For these reasons, **IT IS ORDERED** that Plaintiff's Amended Motion (Doc. 35) is

**DENIED**.   Count III of the Complaint, the state law claim, is **DISMISSED WITH**

**PREJUDICE** as this Court lacks jurisdiction to hear that claim.

**IT IS SO ORDERED** on this 23rd day of April, 2021.

 

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE