**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**MARIA MURGUÍA**                                                    **PLAINTIFF**

**V.**                                    **CASE NO. 5:20-CV-5221**

**CHARISSE CHILDERS, in her official
Capacity as Director of the Arkansas
Division of Workforce Services**                    **DEFENDANT**

## MEMORANDUM OPINON AND ORDER

This Title VI case arises out of a claim for unemployment benefits ("UI"). Defendant Charisse Childers is sued in her official capacity as Director of the Arkansas Division of Workforce Services ("ADWS" or "DWS"), the state agency responsible for UI administration.

Plaintiff María Murguía filed suit on December 18, 2020. *See* Doc. 2. She alleges DWS intentionally discriminated against her as a Spanish-speaking Mexican immigrant in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d.[1] According to Ms. Murguía, DWS failed to provide adequate language access services and, through one of its employees, mistreated her. She contends this caused a significant delay in UI payment. Furthermore, Ms. Murguía asserts, while she has now received her UI benefits,

---

[1] Ms. Murguía initially brought two additional claims. Her Complaint raised a state law claim that she dismissed on the record during the preliminary injunction hearing. *See* Doc. 52, pp. 11–12. She agreed with the Court that sovereign immunity bars a claim in federal court for injunctive relief against a state official based on state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). The Complaint also raised a procedural due process claim alleging that the delay in benefits payment amounted to a constitutional violation. However, Ms. Murguía appears to have dropped this claim in her Response (Doc. 145). The Court presumes that is because the claim is moot. Ms. Murguía sought only injunctive relief requiring the agency to adjudicate her claim, which DWS has now done.

timely resolution would have made her eligible for an additional $1,800 that is no longer available.

Now before the Court are the parties' respective motions for summary judgment (Docs. 122 & 128).[2] The Court also addresses Ms. Murguía's Motion for Sanctions (Doc. 97).[3] For the reasons stated below, DWS's Motion for Summary Judgment is **GRANTED,** Ms. Murguía's Motion for Summary Judgment is **DENIED,** and Ms. Murguía's Motion for Sanctions is **DENIED.**

## I.      BACKGROUND

Below, the Court reviews the genesis of Limited-English Proficiency ("LEP") regulations, federal LEP requirements and DWS's adoption thereof, the DWS claim processing procedure, and the sequence of events that led to the present controversy.[4]

### A.  Title VI Implementing Regulations & DWS Policy

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on "race, color, or national origin . . . under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Congress authorized federal agencies to effectuate the statute's core

---

[2] In ruling, the Court considered Plaintiff's Motion for Summary Judgment (Doc. 128), Memorandum Brief in Support (Doc. 129), and Statement of Facts in Support (Docs. 130 & 131); Defendant's Response in Opposition (Doc. 138); Defendant's Response to Plaintiff's Statement of Facts (Doc. 139) and Plaintiff's Reply (Doc. 144); Defendant's Motion for Summary Judgment (Doc. 122), Memorandum Brief in Support (Doc. 136), and Statement of Facts in Support (Docs. 127, 136, 137); Plaintiff's Response in Opposition (Doc. 145); Plaintiff's Response to Defendant's Statement of Facts (Docs. 146 & 147); and Defendant's Reply (Doc. 148).

[3] The Court considered Plaintiff's Motion for Sanctions (Doc. 97), Defendant's Response in Opposition (Doc. 106), and Plaintiff's Reply (Doc. 109).

[4] Unless otherwise noted, the facts recited below are undisputed.

purpose by "issuing rules, regulations, or orders of general applicability"—and enforcing them. 42 U.S.C. § 2000d-1.[5]

Title VI "impose[s] upon Federal officials not only the duty to refrain from participating in discriminatory practices, but the affirmative duty to police the operations of and prevent such discrimination by State or local agencies funded by them." *NAACP, W. Region v. Brennan*, 360 F. Supp. 1006, 1012 (D.D.C. 1973). If a federal agency determines compliance cannot be achieved by "voluntary means," it may terminate federal financial assistance or pursue "any other means authorized by law," 42 U.S.C. § 2000d-1, which includes referral to the U.S. Department of Justice ("DOJ") to undertake civil prosecution, Title VI Coordination and Enforcement Memorandum (U.S. Dep't of Justice Aug. 19, 2010).

The Executive Branch has long interpreted discrimination based on national origin to encompass discrimination based on limited English proficiency. *See, e.g.,* Exec. Order No. 13,166, 65 Fed. Reg. 50121 (Aug. 16, 2000). To that end, the U.S. Department of Labor ("DOL") promulgates regulations that require federal funding recipients—including state UI agencies like DWS—to "take reasonable steps to ensure meaningful access to their programs and activities by LEP persons." Policy Guidance to Federal Financial Assistance Recipients Regarding the Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 68 Fed. Reg. 32289 (U.S.

---

[5] Courts often refer to Title VI by its public law citation. Public Law 88-352, Title VI, § 601, July 2, 1964, 78 Stat. 252—or "§ 601"—is codified at 42 U.S.C. § 2000d and contains the foundational prohibition against discrimination on the ground of race, color, or national origin in any program receiving federal assistance. Public Law 88-352, Title VI, § 602, July 2, 1964, 78 Stat. 252—or "§ 602"—is codified at 42 U.S.C. § 2000d-1 and authorizes federal agencies to issue regulations effectuating the provisions of § 601.

Dep't of Labor May 29, 2003). To assess compliance under this "flexible and fact-dependent standard," the DOL balances: (1) the number or proportion of LEP persons served by the recipient; (2) the frequency with which LEP individuals come into contact with the recipient's program; (3) the nature and importance of the program; and (4) the resources available to the recipient and costs. *Id.*

DOL regulations require recipients to "ensure that every program delivery avenue (e.g., electronic, in person, telephonic) conveys in the appropriate languages how an individual may effectively learn about, participate in, and/or access" UI benefits, 29 C.F.R. § 38.9(c), and "provide adequate notice to LEP individuals of the existence of interpretation and translation services and that these language assistance services are available free of charge," 29 C.F.R. § 38.9(e).

The regulations further specify that an accompanying adult may serve as an interpreter only "when the information conveyed is of minimal importance to the services to be provided or when the LEP individual specifically requests that the accompanying adult provide language assistance, the accompanying adult agrees to provide assistance, and reliance on that adult for such assistance is appropriate under the circumstances." 29 C.F.R. § 38.9(f)(2)(ii). "When the [agency] permits the accompanying adult to provide such assistance, it must make and retain a record of the LEP individual's decision to use their own interpreter." *Id.* DOL guidance instructs that "UI agency staff should be trained to identify language access barriers and provide affected claimants alternative access options." Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 02-16, at 10 (Oct. 1. 2015).

The DWS Operations Manual incorporates these requirements. If "it appears a client has limited English proficiency, ADWS staff must determine the language spoken and enlist an interpreter on the client's behalf," regardless of whether a formal request was made. (Doc. 131-3, p. 70).

The Manual also outlines "informal interpreter" protocol:

LEP clients frequently report to a local office accompanied by relatives or friends who intend to serve as interpreters. ADWS staff should be cautious in determining the ability of informal interpreters and should offer free LEP interpretation services to the clients.

If the LEP client voluntarily chooses to provide their own interpreter, a DWS-ARK-599 form must be completed to allow ADWS to speak with the chosen interpreter about the claim. This form must also be imaged to the claim and the service file must be documented.

ADWS staff will not be required to obtain an interpreter for a LEP client when an informal interpreter is available, able, and a DWS-ARK-599 form was completed.

*Id.* at p. 69.

As to document translation, DOL regulations require state agencies to "translate vital information in written materials into [commonly used languages] and make the translations readily available in hard copy, upon request, or electronically such as on a Web site." 29 C.F.R. § 38.9(g)(1). Vital information is defined as any "information, whether written, oral, or electronic, that is necessary for an individual to understand how to obtain any aid, benefit, service and/or training; necessary for an individual to obtain any aid, benefit, service, and/or training; or required by law." 29 C.F.R. § 38.4(ttt).

Communications containing vital information must contain a Babel notice, 29 C.F.R. § 38.9(g)(3), which is a short statement included in a document "in multiple languages informing the reader that the communication contains vital information, and

explaining how to access language services to have the contents of the communication provided in other languages." 29 C.F.R. § 38.4(i). Furthermore, "once a recipient becomes aware of the non-English preferred language of an LEP beneficiary . . . , the recipient must convey vital information in that language." 29 C.F.R. § 38.9(h).

The DOJ considers it "strong evidence" of regulatory compliance if the recipient "provides written translations of vital documents for each eligible limited English proficiency language group that constitutes five percent or 1,000, whichever is less, of the population of persons eligible to be served or likely to be affected or encountered." Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455-01 (U.S. Dep't of Justice June 18, 2002).

Because the Spanish-speaking LEP population in Arkansas exceeds five percent, DWS has translated some vital documents into Spanish. Others remain available only in English. *See* Doc. 131-3, p. 64.

According to DWS LEP Coordinator Corina Parra, while a claimant can be identified as Spanish-speaking in the DWS case management system, this does not trigger forms in Spanish to be mailed to the claimant. *See* Doc. 136-16, p. 91. Instead, most documents sent to claimants (or otherwise produced by DWS) contain a Babel notice alerting the reader to the availability of language assistance. DWS employs two variations:

(1) The "Pressure Sealed Form Phrase" Babel notice, which states: "Interpretation/Translation services available through your local office."

(2) The "Inserted Forms Phrase" Babel notice, which states: "Important: This document contains important information about your unemployment insurance rights, responsibilities and/or benefits. It is

> critical that you understand the information contained in this document. If you need assistance in the translation and understanding this information, please report to your local office immediately. If you disagree with this determination or decision, you must file an appeal before the deadline specified in the determination or decision."

(Doc. 131-3, p. 51).[6]

## B. DWS Claim Processing Procedure

UI claimants may apply for Unemployment Insurance Benefits (the "Initial Claim") either online or in person at a DWS local office. When a UI claim is opened, DWS sends notice to the claimant's last employer and to any other base-period employers. By statute, employers have 10 and 15 days, respectively, to respond to the notice, after which they may be deemed to have waived the right to respond. *See* Ark. Code Ann. §§ 11-10-505(a)(2)(A) & 11-10-521(b)(2)(A). However, ADWS Assistant Director of the Unemployment Program Kesha Rogers Kelly[7] testified that if information comes in after the deadline but before the claim has been processed, DWS may consider that information. *See* Doc. 52, pp. 167–68.[8]

---

[6] Ms. Parra testified that DWS uses three different Babel notices, *see* Doc. 136-16, p. 105, but the 2021 Language Access Plan lists only the two identified here, *see* Doc. 131-3, p. 51.

[7] When Ms. Kelly testified in the Preliminary Injunction Hearing in March 2021, she served as Assistant Director of the Unemployment Program at DWS. (Doc. 52, p. 143). In July 2021, she became Program Administrator of the Unemployment Insurance Tax Division, which is the position she held when she provided testimony in a September 2021 deposition. (Doc. 136-15, p. 9). Citations to Doc. 52 reflect Ms. Kelly's PI Hearing testimony; citations to Doc. 136-15 or Doc. 131-2 reflect Ms. Kelly's deposition testimony.

[8] Arkansas law provides that if a last employer or base-period employer fails to respond to the notice within the statutorily defined period, the employer "shall be deemed to have waived the employer's right to respond," Ark. Code Ann. §§ 11-10-505(a)(2)(A) & 11-10-521(b)(2)(A). Upon waiver, DWS "may accept the statement given by the claimant as his or her reason for separation" and may base [the] determination on th[at] statement." Ark.

To be eligible for UI benefits, a claimant must be unemployed (totally or partially), able to work, available to work, and actively seeking work. *See* Arkansas Division of Workforce Services, Unemployment Information Handbook (DWS-ARK-500) 1, 8 (2018). After submitting an Initial Claim, the claimant must make weekly certifications of eligibility and report any wages earned. *Id.* at 11. DWS allows claimants to file the weekly claim either online (via ArkNet) or by phone (via ArkLine). *Id.* at 16. The latter is an automated system that provides the caller with the option of proceeding in English or Spanish. *See id.* at 16–19. Claimants must file weekly while unemployed, even if initially denied benefits and waiting for an appeal hearing. *See id.* at 11.

If there is a dispute regarding the reason for separation or DWS believes the reason for separation may be disqualifying, the claim goes to "adjudication." Adjudication is a fact-finding process but does not involve a hearing—the DWS adjudicator gathers information from the claimant and the employer and then issues an initial decision about whether the claimant qualifies for benefits. If the claimant is found ineligible, he or she has the right to seek an appeal from the Appeal Tribunal. *See* Ark. Code Ann. § 11-10-524. Based on the information presented, the Appeal Tribunal may then refer a claim back to DWS for further investigation and review. *See* Doc. 52, p. 187.  Ms. Kelly testified that, when a claim is remanded, there is no system for prioritizing those in which DWS has made an error—such claims rejoin the line for adjudication. *Id.* at p. 166. Once a claimant has been found ineligible, she must work another 30 days in a qualifying position before she is eligible to apply for UI benefits again. *Id.* at p. 193.

---

Code Ann. §§ 11-10-505(a)(2)(B) & 11-10-521(b)(2)(B). However, it appears that DWS generally declines to exercise this discretion.

### C. Plaintiff María Murguía

María Murguía was born in Mexico and is now a legal permanent resident of the United States. She speaks Spanish fluently but can read and write "very little." (Doc. 52, p. 119). She does not speak any English. *Id.*

Ms. Murguía worked for Molly Maid of Northwest Arkansas until November 2019, *see* Doc. 131-3, pp. 129–32, when she left to begin a job at Holiday Inn in Bentonville, *see* Doc. 52, p. 96. Formally, her Holiday Inn employer was Interstate Management Company, LLC. *See id.* at p. 179. In March 2020, occupancy rates at Holiday Inn dropped due to the COVID-19 pandemic, and Ms. Murguía was laid off. *See* Doc. 35-1, p. 1.

On April 2, 2020, Ms. Murguía and her then 20-year-old daughter Alejandra went to the DWS office in Fayetteville. Alejandra speaks both English and Spanish.[9] While waiting in line, Alejandra completed a paper application in English on her mother's behalf. *See* Doc. 52, p. 59. She listed Holiday Inn as Ms. Murguía's most recent employer. *See* Doc. 131-1, p. 81. When they reached the front of the line, Ms. Murguía handed the paper application to an employee, who also made copies of Ms. Murguía's permanent resident card. *See id.* at p. 107; Doc. 52, p. 20.

Several days later, a DWS employee entered the information from Ms. Murguía's application into DWS's computer system. When the DWS employee looked in its internal database, the wages Ms. Murguía earned at Holiday Inn did not appear because, as it was later discovered, the company recorded Ms. Murguía's social security number incorrectly. Ms. Kelly testified that the proper procedure would have been to contact Ms.

---

[9] Alejandra testified that she speaks Spanish and knows how to read and write in Spanish. However, she does not have any formal training in interpretation and is not comfortable translating legal terminology. *See* Doc. 52, p. 18.

Murguía to provide paystubs to corroborate her employment. *See* Doc. 52, p. 184 ("[I]f an employer is not showing up, we usually ask the claimant for paycheck stubs to see if we can figure out why the employer is not showing up. It could have been the employer did not report earnings."). But the employee likely saw that Ms. Murguía's most recent wages were from Molly Maid and wrongly listed that company as the last employer in the electronic application. *See id.* at pp. 148–52.[10] This error by DWS set the stage for a cascade of additional errors that would soon follow.

DWS generated a Notice of Monetary Determination based on Ms. Murguía's wage history with Molly Maid, which was mailed to her on April 9, 2020. *See* Doc. 131-3, p. 123. As Ms. Murguía's (incorrectly listed) last employer, Molly Maid also received a notice. *Id.* at pp. 129–32. Molly Maid disputed that Ms. Murguía had been laid off and provided evidence that she quit her job in November 2019. *Id.*

Ms. Murguía also disputed the agency's monetary determination. On May 7, 2020, she faxed a letter to the agency stating that she was "laid off from Holiday Inn Hotel due to COVID-19," "do[es] not work for Molly Maid of Northwest Arkansas," and "was not laid off from Molly [M]aid of Northwest Arkansas." (Doc. 38-2, p. 20). However, Ms. Murguía's letter was not added to her file until June. *See* Doc. 52, p. 173.[11] Around the same time, a DWS staff member reviewed Ms. Murguía's claims file and determined that Ms. Murguía

---

[10] DWS maintains that the error originated with Ms. Murguía. *See, e.g.,* Doc. 123, p. 3. The evidentiary record makes that unlikely. But, because DWS did not retain Ms. Murguía's original paper form, the Court cannot say so definitively. Regardless, relative responsibility for the error has no impact on the Court's analysis. It is not a material fact.

[11] Besides imaging Ms. Murguía's May 7 letter to her file, DWS did not take any action in response to the letter. *See* Doc. 131-2, p. 130.

was not eligible for UI benefits because she quit her job with Molly Maid. *See* Doc. 131-2, p. 129.

On June 10, 2020, DWS sent Ms. Murguía a Notice of Agency Determination (Form AAS-578) in English denying her UI benefits. *See* Doc. 131-3, p. 133.   It listed "Molly Maid of Northwest Arkans [sic]" as the employer. *Id.* With the help of her daughters, Ms. Murguía submitted a petition for appeal on June 17, 2020. *See* Doc. 131-1, p. 76.

On July 16, 2020, DWS's Appeal Tribunal sent Ms. Murguía a Notice of Telephone Hearing—in English and without a Babel notice—listing the employer's name as "Molly Maid of Northwest Arkans [sic]" and setting the hearing for July 28, 2020. *See* Doc. 35-1, pp. 11–12. On July 24, however, Ms. Murguía sent a typed letter withdrawing her appeal. (Doc. 38-3, p. 2).[12] Ms. Murguía stated that she did not understand why Molly Maid was listed as her employer and explained that, because of this, "it does not make sense to move forward with the appeal as it is set up." *Id.* As a result, the appeal was dismissed. *See* Doc. 131-3, p. 135. The Appeals Tribunal did not contact the adjudication department regarding the incorrect employer issue. *See* Doc. 131-2, p. 133.

About a month later, on August 25, Ms. Murguía and Alejandra visited the DWS Fayetteville office to request that Ms. Murguía's UI claim be considered based on her most recent employment with Holiday Inn. *See* Doc. 52, p. 38. They spoke with DWS employee Raymond Michaud at the intake point, who told Ms. Murguía to come back with her paystubs from Holiday Inn. When Ms. Murguía and Alejandra returned the next day,

---

[12] Legal Aid of Arkansas began representing Ms. Murguía on July 23, 2020. *See* Doc. 136-1, p. 68. The parties agreed to the following statement: "Legal Aid assisted in preparing the letter of withdrawal of the hearing request that is dated July 24." *Id.* at pp. 78–79. Legal Aid further clarified that it did not stipulate to having helped Ms. Murguía fax the letter. *Id.*

paystubs in hand, Mr. Michaud refused to add them to her file, *see id.* at p. 41, though he acknowledged that the proper procedure would have been to do so, *see id.* at p. 220.[13] Both women felt that Mr. Michaud was very rude and angry, causing them to conclude he was racist towards Mexicans. *See id.* at pp. 45–46, 114.

On September 23, Legal Aid contacted Eduardo Lemm, a Regulatory Advisor with DWS, seeking help with Ms. Murguía's situation. *See* Doc. 52, p. 229. Mr. Lemm forwarded Legal Aid's email to Ms. Parra. *Id.* at p. 232. Alejandra emailed the paystubs from Holiday Inn to Ms. Parra,[14] *see id.* at pp. 47, 114, 165; Doc. 44, p. 5, and DWS promptly issued a new Notice of Monetary Determination reflecting those wages, *see* Doc. 131-3, p. 139, and a Notice of Amended Determination stating that the June 10 decision "was issued in error since this was not the claimant's correct last work," *id.* at p. 140.

The process began anew, with notice going out to Interstate as Ms. Murguía's last employer. *See* Doc. 38-2, p. 38. Interstate never replied to oppose Ms. Murguía's claim based on her most recent employment. However, Equifax responded based on a previous job Ms. Murguía held with Interstate between July 2016 and September 2017. *See id.* at p. 39. Though this was actually non-responsive to DWS's Notice to Last Employer sent on September 25, 2020, *see id.* at p. 38, Ms. Kelly testified that it was sufficient to get Ms.

---

[13] Mr. Michaud testified that "[t]he policy is, whenever a claimant presents any type of documentation, that we will accept the documentation and image it into their file." (Doc. 52, p. 220).

[14] It appears DWS did not immediately image Ms. Murguía's Holiday Inn paystubs to her file. In an email sent on December 15, 2020, Ms. Parra acknowledged that Ms. Murguía had previously provided the Holiday Inn paystubs to DWS and explained, "I am including them below because I didn't see them in imaging." Doc. 131-3, p. 156. Ms. Parra's email, along with the earning statements, were imaged to Ms. Murguía's service file and time-stamped as "Received: 12/18/2020." *Id.* at pp.157–65.

Murguía's claim sent to adjudication again when DWS processed Equifax's response on October 29, 2020.

On March 26, 2021, DWS issued a new Notice of Agency Determination. It listed the correct employer, Interstate Management Company LLC, and concluded that the "employer has not established that the claimant was the first to initiate the separation." (Doc. 131-3, p. 178). Over the next month, Ms. Murguía received $17,816 in UI benefits for the weeks between April 4 and November 7, 2020. *See id*. pp. 119–22.

Unfortunately, DWS soon initiated a fraud investigation into Ms. Murguía. On April 1 and 5, 2021, DWS sent Ms. Murguía two fraud-related Interview Notices (FIRE-BLO2), which Legal Aid helped her to complete and return. *See id.* at pp. 183–86. It took almost another year and continued representation by Legal Aid to resolve the allegations.

Between April 2020 and April 2021, Ms. Murguía was required to make weekly certifications attesting to her continued eligibility for UI benefits.[15] Ms. Murguía did not know she needed to report any wages she earned, so when she started working part-time for Dow Enterprises in December 2020, she failed to adjust her weekly certification. According to Ms. Murguía, she "never received any information in Spanish explaining the requirement to report part-time income, however minimal." (Doc. 129, p. 16).

On August 13, 2021, DWS sent Ms. Murguía two fraud-related Notice of Agency Determinations (FIRE-578). *See* Doc. 131-3, pp. 209–12. The agency concluded that Ms. Murguía committed fraud due to unreported earnings. *Id*. Ms. Murguía appealed the finding. An Appeal Tribunal hearing was held on January 31, 2022. *See* Doc. 131-2, p.

---

[15] Because she did not speak English—and did not realize ArkLine allows callers to proceed in Spanish—Ms. Murguía asked her daughter Lourdes to make the certifications on her behalf. Lourdes did so each week. *See* Doc. 52, p. 101.

279. According to Ms. Murguía, "an interpreter was on the line and was interpreting in Spanish what others on the line said in English," *id.*, but, at some point, "the interpreter [suddenly] stopped interpreting . . . [and] there was no interpreter on the line for the rest of [the] hearing." *Id.*

The Appeal Tribunal held that when Ms. Murguía "filed her claims for the weeks ending December 19, 2020, through March 27, 2021, she incorrectly reported her earnings for Dow Enterprises; however, [Ms. Murguía] did not realize she was required to report her wages from part time work, and she did not fully understand the employment laws due to her inability to speak English." *Id.* at 295. Thus, the Tribunal concluded, Ms. Murguía "did not willfully misrepresent material facts when filing her weekly claim." *Id.*[16]

---

[16] It appears DWS also audited Ms. Murguía's UI claim with respect to her employment with Interstate and her (alleged) employment with Staffmark Investment LLC. The Court briefly summarizes below.

Between October 2020 and February 2021, DWS sent Ms. Murguía several forms in English that requested additional information about her prior employment and the reason for separation. She filled them out, first with Alejandra's help and then with Legal Aid's, and timely returned them to the agency. *See* Doc. 35-2, pp. 11–12; Doc. 131-3, pp. 171–76. Ms. Murguía's UI claim sat in limbo during this period, but DWS was quite busy. Between December 1, 2020, and December 14, DWS sent three notices to Interstate Management alerting the company that DWS was auditing Ms. Murguía's claim and requesting additional information. *See* Doc. 131-3, p. 149–54. It also sent a Notice to Last Employer to Staffmark Investment LLC on December 14. *See id.* at p. 169. Equifax replied on December 23, stating that Ms. Murguía worked a single day on October 20, 2020, for Staffmark and alleging that Ms. Murguía abandoned the job. *See id.* at p. 170.

On March 26, 2020, DWS issued two Notices of Agency Determination, one with respect to Interstate and the other with respect to Staffmark. Each Notice stated the same: "The claimant has not shown the intent to quit. The employer has not established that the separation was initiated by the claimant." (Doc. 131-3, pp. 177–78). DWS concluded neither disqualified Ms. Murguía from receiving unemployment benefits. *See id.*

## II.    LEGAL STANDARD

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56. If the moving party meets its burden, the nonmoving party must then "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*

To be material, a fact must "affect the outcome of the suit under the governing law." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient' to survive summary judgment." *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Liberty Lobby*, 477 U.S. at 252). The non-moving party must instead produce sufficient evidence "such that a reasonable jury could return a verdict" in their favor. *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248 (1986)).

"Where the parties file cross-motions for summary judgment," as Ms. Murguía and DWS do here, the Court "view[s] each motion separately, drawing all inferences in favor of the nonmoving party." *Shea v. Millett*, 36 F.4th 1, 6 (1st Cir. 2022) (quoting *Fadili v. Deutsche Bank Nat'l Tr. Co.*, 772 F.3d 951, 953 (1st Cir. 2014)). "Under the same rule, if upon review of a party's motion for summary judgment, the court, viewing the evidence

in the light most favorable to the nonmoving party, enters summary judgment for the moving party, the court may properly declare the opposing party's cross-motion for summary judgment as moot." *Smarra v. Boilermaker-Blacksmith Nat'l Pension Tr.*, 2022 WL 377432, at \*4 (W.D. Pa. Feb. 8, 2022) (citing *Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017)).

The Court begins by analyzing DWS's Motion for Summary Judgment (Doc. 122) and thus draws all inferences in favor of the nonmovant, Ms. Murguía. Even construing all facts in Ms. Murguía's favor, the Court concludes no genuine issue remains for trial and DWS is entitled to judgment as a matter of law. Accordingly, the Court does not separately analyze Ms. Murguía's Motion (Doc. 128).

## III.   DISCUSSION

Title VI of the Civil Rights Act of 1964 provides a private right of action only for claims of intentional discrimination, not disparate impact. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). "To establish the elements of a prima facie case under Title VI, a complaining party must demonstrate that his/her race, color, or national origin was the motive for the discriminatory conduct." *Thompson By & Through Buckhanon v. Bd. of Special Sch. Dist. No. 1 (Minneapolis)*, 144 F.3d 574, 581 (8th Cir. 1998). While "discriminatory purpose" need not be the only motive, it "implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Intentional discrimination, in other words, "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

16

DWS measures success by "its ability to cushion the impact of economic downturns, bring economic resilience and prosperity to the state, and meet the needs of Arkansas employers and job seekers." Workforce Services: About, Arkansas Division of Workforce Services, https://dws.arkansas.gov/workforce-services/about-dws/. With respect to Ms. Murguía, the record suggests that DWS failed. In a time of great economic need, Ms. Murguía waited over a year to receive unemployment assistance. But while this Court empathizes deeply with Ms. Murguía, Title VI does not provide relief. Liability here turns on the presence of discriminatory intent, and Ms. Murguía does not produce sufficient evidence to support an inference of intentional discrimination as a matter of law.

For its part, DWS argues most of the issues encountered by Ms. Murguía were of her own making. The Court finds that unpersuasive. However, the record shows an astounding confluence of errors, compounded by the pandemic's effect on agency workload and operations, caused the various obstacles Ms. Murguía encountered—not animus.

## A.  Framework

To determine whether a federal funding recipient intentionally discriminated against beneficiaries in violation of Title VI, courts rely on several established frameworks.

A plaintiff may establish intentional discrimination through either direct or indirect evidence. *See King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption," *Rashdan v. Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014)

(internal brackets omitted),[17] and often consists of either an express classification based on race, color, or national origin, or a decisionmaker's express acknowledgment of discriminatory intent.

"The issue of intent, however, is one that is often not susceptible to direct proof, and a court should consider all conflicting inferences that may be presented by the circumstantial evidence in the case." *Washington v. Duty Free Shoppers, Ltd.*, 710 F. Supp. 1288, 1289 (N.D. Cal. 1988) (citing *Rogers v. Lodge*, 458 U.S. 613, 618 (1982)). Where "the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Griffith*, 387 F.3d at 736.[18]

---

[17] *See also Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) ("Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." (internal quotation marks omitted)).

[18] Ms. Murguía argues the Court may assess indirect evidence of intentional discrimination under either the *McDonnell Douglas* framework or a deliberate indifference standard. Under the latter, according to Ms. Murguía, the defendant is deliberately indifferent—and thus, intentionally discriminates—when it has knowledge that harm to a protected right is likely and fails to act on that likelihood.

The Court's own review indicates the Eighth Circuit applies the deliberate indifference standard for proving intentional discrimination in two types of claims: (1) those stemming from third-party harassment based on a protected characteristic, often in an educational setting, *see, e.g., Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (holding school district was liable under Title IX only if its deliberate indifference to prior reports of sexual assault effectively caused the discrimination against the plaintiff), and (2) those brought under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, *see, e.g., Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (holding that deliberate indifference to the fact that a given action will result in violation of federally protected rights may support an inference of discriminatory intent). Because Ms. Murguía's claim does not resemble the circumstances in either context, the Court declines

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a prima facie case.[19] *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 515 (8th Cir. 2011). She may do so through "evidence giving rise to an *inference* that she has been intentionally discriminated against because of her" national origin. *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019) (emphasis added).

"An inference of racial discrimination may be established by showing that a similarly-situated person of another race was treated more favorably." *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 899 (8th Cir. 2020). "To be similarly-situated, the person must possess all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination." *Id.* (cleaned up). However, absent an appropriate comparator, a plaintiff may present a mosaic of facts that, together, support an inference of discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (holding that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available"). This "requires examining the totality of the relevant facts, including racially discriminatory impact, historical background, the sequence of events leading up to the challenged decisions,

---

to adopt the deliberate indifference standard in place of the *McDonnell Douglas* framework.

[19] In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court established a three-step burden-shifting framework by which to analyze claims of discrimination under Title VII. Since then, courts have adopted the *McDonnell Douglas* framework to assess claims of discrimination under other federal civil rights laws, including Title VI. *See Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998) (affirming use of the framework in the Title VI context); *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 355 (8th Cir. 2020) (applying *McDonnell Douglas* to analyze a Title VI claim for discrimination based on race).

and legislative or administrative history." *Mensie v. City of Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019) (internal quotation marks and citation omitted). "[E]vidence that would be weak if considered alone can, if bolstered by other facts in the record, support an inference of discrimination." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008), *as corrected* (Jan. 21, 2009).

Once the plaintiff establishes a prima facie case, "the burden of production then shifts to the [defendant] to articulate a legitimate non-discriminatory reason" for its action. *Tusing*, 639 F.3d at 515. The defendant's explanation "must be clear and reasonably specific." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

If the defendant meets that burden of production, the burden shifts back to the plaintiff "to demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." *Tusing*, 639 F.3d at 515 (cleaned up). "This requires more than merely disputing the reason; the plaintiff must present evidence 'that the reason was false, and that discrimination was the real reason.'" *Lucke*, 912 F.3d at 1087–88 (quoting *Ryther v. KARE 11*, 108 F.3d 832, 838 n.5 (8th Cir. 1997)); *see also Torgerson*, 643 F.3d at 1051 (8th Cir. 2011) (holding that plaintiff may show "pretext by persuading the court that a prohibited reason more likely motivated the employer" (internal quotation marks and brackets omitted)).

In the Eighth Circuit, surviving summary judgment requires "the plaintiff [to] adduce enough admissible evidence to raise a genuine doubt as to the legitimacy of the defendant's motive, even if that evidence does not directly contradict or disprove the defendant's articulated reasons for its actions." *Lucke*, 912 F.3d at 88 (cleaned up) (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005)).

Ms. Murguía relies on two sets of facts to prove intentional discrimination: (1) language access deficiencies, and (2) DWS employee Raymond Michaud's behavior on August 26, 2020. Each is evaluated below.

### B.  Language Access Deficiencies

"[P]rovision of English notices and program information to Spanish-speaking LEP individuals and households" may show "discrimination based on national origin." *Almendares v. Palmer*, 222 F.R.D. 324, 328 (N.D. Ohio 2004). But it does not alone establish liability. *See Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010) (explaining that "deficient programming in and of itself is not evidence of intentional discrimination based on national origin"). Ms. Murguía must present facts to show intentional discrimination: that DWS's policies and conduct were *motivated by* national origin animus.

As the undisputed facts make clear, DWS did not provide Ms. Murguía adequate LEP services, and DWS's LEP policies and practices often proved deficient. Nevertheless, these failures, even taken together, do not amount to intentional discrimination

### 1.  Ms. Murguía's Encounter with DWS on April 2, 2020

On April 2, 2020, Ms. Murguía and Alejandra visited the DWS's Fayetteville office. While Ms. Murguía and Alejandra spoke to one another in Spanish in front of the DWS worker, they were not offered an interpreter.

Pursuant to DWS operating protocol, the employee should have inquired into Ms. Murguía's LEP status and offered to provide an interpreter at no charge. *See* Doc. 131-3, p. 70. Federal regulations require DWS "to provide adequate notice to LEP individuals

of the existence of interpretation and translation services and that these language assistance services are available free of charge," 29 C.F.R. § 38.9(e), and prohibit DWS from "requir[ing] an LEP individual to provide their own interpreter," 29 C.F.R. § 38.9(f)(1).

Private litigants may not bring suit to enforce federal regulations promulgated pursuant to § 602. *See Sandoval*, 532 U.S. at 293. However, that fact alone does not render evidence of DWS's noncompliance with federal regulations irrelevant to the parties' respective burdens of proof. Federal regulations and internal operating procedures put DWS staff on notice regarding LEP obligations, and their failure to adhere to these protocols might contribute to an inference of intentional discrimination. *See Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1158–59 (9th Cir. 2013) ("[A] court analyzes whether the defendant's actions were motivated by a discriminatory purpose by examining . . . the defendant's departures from its normal procedures or substantive conclusions," among other factors.). The record in this particular case, however, does not support such an inference.

Fayetteville Office Manager John Jones testified that "[d]uring COVID, we were taking applications in huge numbers. [P]rior to COVID, we had like 69 brand new claims, and . . . three weeks following, we had like 12,000 brand new claims that [were] processed through this office." (Doc. 136-11, p. 61). According to Mr. Jones, DWS employees often had minimal interaction with claimants in the early days of COVID-19. *See id.* at pp. 104. For the most part, claimants simply dropped off paper applications, and DWS staff later manually entered the information into the DWS database to create a claim.

The pandemic forced DWS to change its protocol in multiple ways. For example, instead of having claimants fill out their applications on computers inside local offices,

claimants lined up outside and shuffled through one-by-one to hand in paper applications. *See* Doc. 52 at pp. 213–14. According to Mr. Jones, some individuals reported standing in line for four to six hours. The agency also stopped doing ID verification and immigration eligibility checks. *See* Doc. 136-11, p. 61.

To be clear, emergency circumstances such as the COVID-19 pandemic do not excuse intentional discrimation. But, here, there was no evidence of intentional discrimination on April 2, 2020, despite the fact that Ms. Murguía was not offered an agency interpreter. Moreover, Ms. Murguía does not demonstrate any evidence of pretext. She even testified that the DWS employee who assisted her was "really nice" and "treated us very well." (Doc. 131-2, p. 181).

### 2. Interpreter Availability

DWS employs a mix of internal and third-party interpreters (i.e., vendors), although receipts provided by the agency suggest the agency rarely uses the latter. *See* Doc. 136-7.[20]

The DWS 2021 Language Access Plan instructs DWS staff to first identify the LEP client's language need, and then review the "ADWS Interpreter/Translator List" to determine whether a staff member is available to provide interpretation services. *See*

---

[20] Of the approximately 60 payments made to third-party translators between about August 2019 to March 2021, only two represent use of a third-party translator to directly assist a UI claimant in a local office. *See* Doc. 136-7. The remaining payments relate to interpretation services provided in the context of the appeals process. *Id.*

Doc. 136-11, p. 204.[21] DWS instructs staff to first work their way through the internal list before requesting assistance from a vendor. *See* Doc. 136-11, p. 204.

Presently, the Fayetteville office is unable to provide in-person onsite interpretation services. *See* Doc. 136-16, p. 124. When Fayetteville staff identify an individual as LEP, they typically first reach out to Ms. Parra before then trying other DWS employees. *See* Doc. 136-11, p. 76.[22]

Among those employees listed on the "ADWS Interpreter/Translator List," none work exclusively with LEP clients. *See* Doc. 136-16, pp. 114–17. Instead, each is an employee who has volunteered to help translate—if available—when an LEP client requests assistance at a local office. *Id.* Of course, this means interpretation services may not be immediately available. *See id.* at p. 125. However, Ms. Parra testified, DWS staff can often quickly reach someone able to translate. *Id.* According to Mr. Jones, DWS staff in the Fayetteville office also rely frequently on informal interpreters, i.e., a family member or friend that accompanied the LEP client to the office. *See* Doc. 136-11, p. 74.

Ms. Murguía points to a series of emails that Ms. Parra received between about April 2020 to May 2021 from LEP clients seeking assistance in Spanish. *See* Docs. 97-1, 97-3.[23] The Court agrees with Ms. Murguía that the emails reflect LEP individuals

---

[21] The Interpreter/Translator list provides contact information for DWS employees willing to serve as interpreters, including four "certified" Spanish interpreters and one non-certified Spanish interpreter. *See* Doc. 136-16, p. 109.

[22] Mr. Jones testified that, personally, he has never needed to contact a vendor. *See* Doc. 136-11, p. 89.

[23] On January 24, 2022, Ms. Murguía filed a Motion for Sanctions, alleging that DWS "has belatedly produced documents responsive to discovery requests five to six months after the due date without adequate justification." Doc. 97, p. 1. Furthermore, according to Ms. Murguía, "[t]he documents show material facts around the agency's inability to provide

struggling to access services and resources in Spanish. The emails, as evidence, may put DWS on notice of that fact, as well as demonstrate that DWS's existing service model requires some modification. But the emails do not reflect an agency indifferent to serving the LEP population. Many contain a response from Ms. Parra asking the claimant to call her for assistance or indicate that she has contacted someone within DWS to resolve an issue. *See* Doc. 131-3, pp. 88–111. Others originate with a non-Spanish speaking DWS employee seeking help on behalf of an LEP individual. *Id.*

_____

adequate services to Limited English Proficient individuals during the same timeframe in which Ms. Murguía has sought services from DWS." *Id.* The "documents" at issue refer to the emails between Ms. Parra and LEP clients.

The Court addressed DWS's discovery defects in November 2021 on Ms. Murguía's motion. The Court concluded DWS withheld responsive information and failed to comply with the Federal Rules of Civil Procedure. That is why, on November 17, 2021, the Court reopened discovery, ultimately extending it until January 31, 2022. The Court also ordered DWS to show cause, supplement its Response For Production requests, and again search its records for any documents responsive to Ms. Murguía's earlier RFPs. This relief produced the evidence that Ms. Murguía now argues was not timely provided.

Ms. Murguía received the first batch of emails on December 6, 2021, and the second batch on January 7, 2022. She contends "[t]he productions were not provided with enough advance time to complete further discovery about them," *id.* at p. 10, and DWS did not provide phone numbers and addresses for the individuals identified in the emails as requested. The Court disagrees. During this period, the Court ruled on at least three other discovery-related motions filed by Ms. Murguía. She had two months to press the issue but did not raise it until January 24, 2022, seven days before the close of discovery.

Ms. Murguía also argues that the late production prevented her from asking Ms. Parra and Mr. Jones in their September 2021 depositions about the "inadequate LEP services contained in the December 6 and January 7 productions." *Id.* at p. 9. The Court rejects this argument. Ms. Murguía's case fundamentally revolves around allegations of inadequate LEP services. Surely this line of inquiry was available to her in September 2021.

Given DWS's compliance with the Court's November 17, 2021 order and production of responsive documents, the Court declines to grant Ms. Murguía's request for sanctions.

25

When Ms. Murguía visited the Fayetteville office with Alejandra a third time in April 2021, she requested an interpreter. According to Alejandra, the DWS employee disappeared for a few minutes before returning to inform them it would take some time to procure one. *See* Doc. 131-1, p. 101. Because both Ms. Murguía and Alejandra had to leave for work, they signed the necessary forms so that Alejandra could serve as an informal interpreter. *Id.* In total, Ms. Murguía and Alejandra were in the Fayetteville office for about 15 minutes. *Id.* at p. 104.

With regard to this incident, Mr. Jones testified that the DWS employee assisting Ms. Murguía communicated with the UI Supervisor, Gary Morris-Mansee. Mr. Morris-Mansee, according to Mr. Jones, stated that he would find an interpreter but it would take him a few minutes. The employee also let Mr. Jones know that Ms. Murguía was waiting for an interpreter. About 15 minutes later, Mr. Jones went to check to see if she had been assisted but Ms. Murguía had already left.

In the sole instance in which Ms. Murguía requested an interpreter, she waited about 15 minutes. While Ms. Murguía did ultimately leave without receiving interpretation assistance, 15 minutes is not so unreasonable as to suggest intentional discrimination.

### 3. Translation of Vital Documents

DOL LEP regulations require DWS to translate "vital information in written materials [into Spanish] . . . and make the translations readily available in hard copy, upon request, or electronically such as on a Web site." 29 C.F.R. § 38.9(g)(1).

While DWS has translated many "vital documents," it has no Spanish translations for the following:

- Notice of Monetary Determination (AAS-508), (Doc. 131-3, p. 41), which was sent to Ms. Murguía in English four times. *Id.* at pp. 123, 139, 188, 189.

- Notice of Agency Determination (AAS-578), *id.* at p. 41, which was sent in English four times. *Id.* at pp. 133, 140, 177–78.

- Fraud-related Notice of Agency Determination (Form FIRE-578), *id.* at p. 43, which sent in English twice. *Id.* at pp. 209–11.

Even with respect to documents translated into Spanish, DWS often failed to make them available to Ms. Murguía. By September 23, 2020—at the very latest—DWS knew Ms. Murguía required forms to be sent in Spanish. *See* Doc. 131-1, p. 163. Yet it continued to send information in English, including the following:

- Appeal Tribunal Notice of Telephone Hearing (no form number), which Ms. Murguía received three times exclusively in English (Doc. 131-3, pp. 213–214; Doc. 131-2, p. 284), and twice in both Spanish and English (Doc. 131-2, pp. 286–93).

- Appeal Tribunal Decision of Hearing Officer (no form number), received once in English. (Doc. 131-3, p. 135).

- General—Claimant Statement (ARK-AAS525Q1C), received twice in English. *Id.* at pp. 147–48, 174–76.

- Claimant Statement—Incorrect Reason for Separation (ARK-AAS525F1C), received twice in English. (Doc. 35-2, pp. 11–12; Doc. 131-3, pp. 171–72).

- Interview Notice (DWS-FIRE-BLO2), received once exclusively in English, (Doc. 131-3, pp. 183–84), and a second time in both English and Spanish. (Doc. 131-3, pp. 185–86; 203–04).

Moreover, Ms. Murguía's attorney made several explicit requests for material to be sent in Spanish, including when he filed this lawsuit in December 2020 and again on February 28, 2021. *See* Doc. 2, p. 29; Doc. 131-3, p. 173.

DWS believes that its system of primarily mailing forms in English adequately serves LEP claimants because the English-language versions contain a Babel notice.[24]

---

[24] During her deposition, Ms. Parra was asked whether it was "your understanding that federal laws require DWS to translate all vital information." She replied, "To attempt to translate all of them. What they ask is to give reasonable accommodation. And there is [sic] many documents that fall under vital documents, and we translated many of them,

The agency points out that Ms. Murguía did not call the local office to ask for an interpreter, as the Babel notice instructs, *see* Doc. 136-1, p. 39, and some forms were provided in Spanish, *see, e.g.,* Doc. 131-2, pp. 286–93. Ms. Murguía testified that she did not observe the Babel notice on the forms she received. *See* Doc. 131-1, p. 52.

DWS does not adequately explain why it continued to send Ms. Murguía forms in English when a Spanish version was available. This is perhaps the strongest evidence of intentional discrimination Ms. Murguía cites.

Several courts have held that "foreseeable knowledge of disparate impact can provide some basis for inferring discriminatory intent." *Faith Action for Cmty. Equity v. Hawaii*, 2014 WL 1691622, at *12 (D. Haw. Apr. 28, 2014). In *Almendares v. Palmer*, for example, the trial court held plaintiffs stated a claim because they "allege[d] defendants chose to continue a policy of failing to ensure bilingual services and knowing [sic] that Spanish-speaking applicants and recipients of food stamps were being harmed as the consequence." 284 F.Supp.2d 799, 808 (N.D. Ohio 2003). The court concluded that "[i]f these allegations are true, one could logically infer that the policy was implemented and is being continued 'because of' its impact on national origin." *Id.*

Similarly, in *South Camden Citizens in Action v. New Jersey Department of Environmental Protection*, the court held plaintiffs stated a claim under Title VI because they:

---

and we have put a Babel notice on many of them that we were not able to make them [sic] available." (Doc. 136-16, p. 84). As to why the Babel notice does not contain more information, the 2021 Language Access Plan states: "Due to the wide variety of documents being used by the UI program as well as formatting differences among forms, the use of consistent but limited number of Babel Notices will maintain uniformity in client messaging and reduce the risk of a LEP client not being made aware of the importance of a specific document and of the availability of language assistance." (Doc. 131-3, p. 51).

> [A]llege[d] facts which, if proven true, would show not only that the operation of the cement grinding facility would have a disparate impact upon the predominantly minority community of Waterfront South, but also that the [agency] was well-aware of the potential disproportionate and discriminatory burden placed upon that community and failed to take measures to assuage that burden.

254 F. Supp. 2d 486, 497 (D.N.J. 2003). However, the court eventually granted summary judgment to defendants, explaining that "[a] mere awareness of the consequences of an otherwise neutral action will not suffice" to attach liability under Title VI. 2006 WL 1097498, at *22 (D.N.J. Mar. 31, 2006). Because plaintiffs ultimately failed to identify any additional evidence suggesting intentional discrimination, the claim did not survive. *Id.* at *36.

Here, DWS's continued provision of forms in English is clearly problematic. But it appears, first, to primarily impact claimants that apply in person, and second, to be a function of the agency's out-of-date computer system rather than discriminatory intent. *See* Doc. 136-16, pp. 92–94.

If a claimant applies online for UI benefits, they can do so through the EZARC system, which allows the claimant to complete the application entirely in Spanish. Should the claimant need to provide additional information, the EZARC system will generate the necessary forms in Spanish. *See id.* at pp. 96–97. But, Ms. Parra testified, if the claimant makes a mistake in the application or needs to correct the initial claim, a DWS employee will need to generate a second form. That can only be done through INet, the case management system. INet does not allow forms to be printed in Spanish. *Id.*

It appears that when someone submits a paper application for benefits, INet allows DWS to designate Spanish as the preferred language. *Id.* at p. 98. Ms. Parra testified that if the claimant fills out the Spanish language version of the application, the employee will

29

likely mark their claim accordingly. *Id.* Likewise, the EZARC system will also indicate a claimant as Spanish speaking. *Id.* at p. 97. But if the applicant does not apply by EZARC and DWS does not initially designate them as Spanish-speaking, then the only way to indicate language needs is to include a note in the service file. *Id.* at p. 98. It is not clear to the Court whether any method exists to provide Spanish speakers with Spanish-language forms if they do not initially apply through EZARC. However, it is true that, in addition to the EZARC system, some forms are available in Spanish as PDF documents.

Ms. Parra testified that she sometimes translates forms for LEP claimants over the phone. She helps the claimant fill in the form in Spanish, and, she explained, somebody within the agency will translate it after it has been submitted. Ms. Parra, of course, is not always available. But Ms. Murguía testified that Ms. Parra consistently returned her calls within a day. *See* Doc. 131-2, p. 173.

Based on this record, the Court can infer that DWS's system does not reliably ensure that Spanish-speaking clients will receive information in Spanish. The agency appears constrained by outdated technology and too few interpreters. Ms. Parra—and the bilingual family members and friends that accompany LEP clients to DWS—pick up the slack.

But even considering the record in its totality, the evidence does not support an inference of intentional discrimination. Ms. Murguía suggests a range of deficiencies in DWS's LEP practices, but she does not present evidence showing they stem from discriminatory animus.

## C.  Causal Factors

Based on the evidence before it, the Court finds that DWS made multiple errors in Ms. Murguía's case, which caused significant delay in her receipt of benefits. However, no genuine issue of fact exists regarding the source of the issues. Ms. Murguía does not show that these errors relate to her national origin or LEP status, reinforcing the Court's conclusion that animus did not motivate DWS's treatment of Ms. Murguía.

First, it is likely that a DWS employee erred when inputting the name of Ms. Murguía's last employer into the computer system. Second, in initially reviewing Ms. Murguía's claim in June 2020, DWS failed to consider her fax informing the agency that it had made an error in identifying her last employer. Ms. Kelly testified that because of the enormous influx of documents and the increase of claimants, Ms. Murguía's letter was not added to her file until June 9, 2020. *See* Doc. 52, p. 173. As a result, Ms. Murguía's initial claim was adjudicated based on the incorrect last employer and she was denied benefits.

There was an opportunity for Ms. Murguía to appeal the initial denial and point out the error. If she had done so, her claim would have been remanded to DWS for adjudication with the name of her correct last employer. *See* Doc. 136-15, p. 50. There is no dispute that it was Ms. Murguía's own decision, likely on the advice of counsel, to withdraw her appeal. This decision delayed her receipt of benefits. DWS would like to characterize Ms. Murguía's decision to withdraw her appeal as a superseding event that renders the agency blameless in all that follows. That is not quite right. First, Ms. Kelly testified that if Ms. Murguía had pursued her appeal (and corrected the record in July), it still would have taken DWS up to 16 weeks to issue a new determination. *See id.* at p.

31

56. Second, in October 2020, Ms. Murguía's claim listed the correct employer but was again delayed when DWS encountered a discrepancy in its own system and failed to first contact Ms. Murguía before setting the issue for adjudication. That same sequence of events likely would have occurred even if Ms. Murguía had not withdrawn her appeal.

DWS's next error occurred when Ms. Murguía visited the DWS office in August and was directed to return with paystubs to prove her employment at Holiday Inn. When she did, DWS employee Raymond Michaud refused to accept them.[25] Both Ms. Kelly and Mr. Michaud testified that DWS procedure would have been for Mr. Michaud to take and scan any documents Ms. Murguía provided. This error resulted in a four-week delay.

Legal Aid intervened on Ms. Murguía's behalf on September 23, 2020, to have the paystubs added to Ms. Murguía's file and her initial eligibility determination withdrawn. That day, Alejandra emailed Ms. Murguía's paystubs to DWS, which promptly rescinded its previous determination, reopened Ms. Murguía's claim, and listed the correct employer, Interstate. However, DWS did not image the paystubs to Ms. Murguía's file until December 18, 2020. So when Equifax provided inaccurate payment history regarding Ms. Murguía's Interstate employment, the service file contained nothing to contradict it. Had the paystubs been promptly added to Ms. Murguía's file—or if DWS had followed its own protocol to first contact Ms. Murguía before sending her claim back to adjudication—perhaps DWS would have approved her claim, thereby avoiding the six-month backlog in adjudication.

---

[25] The evidence establishes Ms. Murguía visited DWS on these dates, although Mr. Michaud has no memory of that. In addition to Ms. Murguía and Alejandra's testimony—and Ms. Murguía's present status as nonmovant for summary judgment—the record shows that Ms. Murguía's name is on DWS's August 26 sign-in sheet and Mr. Michaud ran an immigration check on Ms. Murguía the same day.

Of course, during this period DWS handled an enormous influx of claims. The Court has no doubt that impacted both accuracy and efficiency. But while that might explain the state's performance, it does not excuse it. DWS exists to deliver aid to Arkansans when they need it most, and Ms. Murguía waited far too long.

### D.  Mr. Michaud

In addition to deficiencies in language access, Ms. Murguía argues that her interaction with DWS employee Raymond Michaud on August 26, 2020, demonstrates intentional discrimination.

Mr. Michaud testified that he has no recollection of any interaction with Ms. Murguía on August 25 and 26, 2020, *see* Doc. 52, p. 208, and DWS maintains it has no knowledge of whether Ms. Murguía and Alejandra visited the Fayetteville office in August 2020, *see* Doc. 139, p. 18. Ms. Murguía's service file does not contain a record of her visit.

However, both Ms. Murguía and Alejandra have consistently testified to this fact. Furthermore, the DWS sign-in sheet for August 26, 2020, contains Ms. Murguía's name, *see* Doc. 131-3, p. 85, and Mr. Michaud ran a check to verify Ms. Murguía's immigration status in SAVE, a federal database, that same day. *See* Doc. 38-2, p. 37; Doc. 131-3, p. 144; Doc. 52, p. 210.

Per DWS policy, according to Ms. Kelly, when a claimant comes in to inquire about their claim, the DWS staff person should place a note in their service file indicating as much, as well as scan and upload any documents the claimant presents. *See* Doc. 52, p. 165; *see also* 136-15, pp. 87–88. Mr. Michaud refused to add Ms. Murguía's Holiday Inn pay stubs to her file, *see* Doc. 52, p. 41, though he acknowledged in his testimony that

the proper procedure would have been to do so, *see id.* at p. 220. He did not offer Ms. Murguía interpretation services.

Both Ms. Murguía and Alejandra testified that Mr. Michaud was very rude and angry, which caused both to conclude that he was racist towards Mexicans. *See id.* at pp. 45–46, 114. However, there is no claim for vicarious liability under Title VI. *See, e.g., Rodgers v. Univ. of Mo. Bd. of Curators*, 56 F. Supp. 3d 1037, 1048 (E.D. Mo. 2014), *aff'd as modified sub nom.*, *Rodgers v. Curators of Univ. of Mo. Sys.*, 634 F. App'x 598 (8th Cir. 2015). "An institution is only liable if it intentionally harassed or discriminated on the basis of race or nationality." *Id.*[26] To rely on Mr. Michaud's failure to assist Ms. Murguía in August 2020 as a basis upon which to infer intentional discrimination, Ms. Murguía must establish that Mr. Michaud's conduct is evidence of the *agency's* intent to discriminate. Some caselaw suggests—and Ms. Murguía argues—that in cases "that do not involve the official policy of the recipient entity," liability might attach under Title VI where "an official who has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Ms. Murguía fails to impute liability to DWS for Mr. Michaud's conduct. Ms. Murguía does not suggest Mr. Michaud's behavior conforms with an informal policy within DWS, constitutes a widely-accepted practice, or even that higher-level staff approved of it. Nor

---

[26] "Liability under Title VI, which parallels that of Title IX, cannot be imputed to institutions based on the actions of their employees." *Goonewardena v. New York*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007). *Cf. Gebser v. Lago Vista Independent Sch. Dist.,* 524 U.S. 274, 287–88 (1998) (school district cannot be held liable for harassment of student by teacher based on principles of constructive notice or vicarious liability under Title IX.)

does she show that DWS officials knew Mr. Michaud previously discriminated against LEP individuals and failed to institute corrective measures.

### *1. Evidence of Comparators*

According to Ms. Murguía, "when white people arrive[d]" in the Fayetteville office on August 26, Mr. Michaud "would have them take a seat, but the Mexicans he made stand." (Doc. 136-1, p. 66). Furthermore, Ms. Murguía and Alejandra both noticed white claimants leaving the office with paper showing that they'd been helped, although both admitted they did not actually know the specifics of other claimants' UI applications or the type of help they received. *See* Doc. 52, pp. 72–73; 137–38.

"[S]howing that a similarly-situated person of another race received more favorable treatment" may provide evidence of intentional discrimination. *Lucke*, 912 F.3d at 1087. But absent more information about the other clients present on August 26, 2020, the Court cannot rely on Ms. Murguía and Alejandra's statements. "A person is similarly situated to the plaintiff if he or she possesses all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination." *Id.* Here, Ms. Murguía has failed to present any evidence that the comparators were similarly situated.

Ms. Murguía argues that "an inference of impermissible motive against the plaintiff may be made when there is evidence of discrimination against other members of the same protected class." *Santos v. Peralta Cmty. Coll. Dist.*, 2009 WL 3809797, at *5 (N.D. Cal. Nov. 13, 2009). The Court agrees. How DWS treated other LEP claimants—or the agency's ratification of individual employees' mistreatment of this population—may be a "relevant component of the 'mosaic' of evidence." *Hasan*, 552 F.3d at 529 (holding evidence of how an employer treated other Muslim employees may prove relevant to

discrimination claim). But relevance "depends on a variety of factors, including 'how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" *Id.* (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)).

Mr. Michaud started at DWS in 2010, and about a year later, was promoted to local office manager for the Rogers and Siloam Springs locations in 2011. He remained in that position until leaving DWS in 2016. *See* Doc. 137-3, pp. 11–12. In 2020, Mr. Michaud returned to DWS in a non-managerial role in the Fayetteville office. *Id.* at pp. 12–13.

In 2015—while Mr. Michaud managed the Rogers office—DOL investigated DWS's language access policy in response to complaints from claimants about the services available in the Rogers, Fayetteville, and Jonesboro offices. The investigation concluded that DWS did not provide adequate interpretation and translation services to LEP individuals in a timely manner or provide such claimants with notice of the language assistance services available. *See* Doc. 131-2, pp. 88–96.

An employee that worked with Mr. Michaud during this period testified that Mr. Michaud discouraged staff from spending too much time helping LEP claimants, refused to act on the employee's report that LEP clients were not being served properly, and, after the investigation began, put little effort into improving services. *See* Doc. 131-1, pp. 238–45, 251–53, 266. Other employees who worked with Mr. Michaud during this period corroborated the description of Mr. Michaud's attitude towards LEP clients. *See* Doc. 131-2, pp. 14, 51.

In 2017—after Mr. Michaud had left DWS—the agency entered into a settlement agreement with DOL and undertook a range of remedial measures. These include, for example, hiring Ms. Parra as LEP Coordinator, conducting a language access needs

assessment, drafting language access plans, training staff, and running an LEP outreach campaign. *See* Doc. 136-2. This renders the relationship between DWS's 2015 LEP policy—and any prior discrimination against the LEP population—and the agency's 2020 practices much weaker.

With respect to Mr. Michaud specifically, the DOL investigation clearly put DWS on notice of LEP issues in the offices managed by him. Perhaps the agency should have investigated Mr. Michaud's individual role in creating those issues, in addition to the system-wide changes it adopted. But, as it is, the evidence does not demonstrate DWS possessed knowledge about Mr. Michaud that the DOL settlement agreement and subsequent remedial measures would not have addressed.

### 2. Complaints about Mr. Michaud

The record also contains testimony from five former employees that worked with Mr. Michaud in his first stint at DWS. They each describe him as a bully who singled out employees for harassment and abuse. Two filed formal sexual harassment claims, a third filed a formal age discrimination claim, and a fourth reported his behavior to her supervisor. Yet it appears DWS leadership made no effort to meaningfully investigate their allegations. The fifth employee, Mr. Michaud's subordinate, testified that she and Mr. Michaud had sex multiple times on DWS property and during business hours. All five eventually resigned due to Mr. Michaud's conduct.

The Court cannot fathom why the agency rehired Mr. Michaud in 2020. His behavior was appalling—and so was DWS's response. But this does not provide evidence relevant to Ms. Murguía's claim of intentional discrimination based on national origin.

### 3.  Mr. Michaud's Personal Life

Ms. Murguía also points to Mr. Michaud's membership in the Sons of Silence motorcycle club to argue he acted with discriminatory animus. Mr. Michaud joined the club in 2005 and has served as president of the Western Arkansas chapter since 2007. *See* Doc. 137-3, pp. 65, 120. According to Ms. Murguía's law enforcement expert, the Sons of Silence represent an international "Outlaw Motorcycle Gang," *see* Doc. 131-2, p. 235, and members are known to "display racist insignia" on clothing or in tattoos, *see id.* at p. 238. The expert concluded that, based on his training and experience, members of the Sons of Silence "commonly embrace a white supremacy ideology." *Id.* at p. 241. However, even if admissible—and that's a big "if"—Ms. Murguía does not suggest the agency possessed knowledge of Mr. Michaud's affiliation prior to rehiring him in 2020. Several employees testified that when Mr. Michaud managed the Rogers office, he sometimes spoke about Sons of Silence while in the workplace. *See* Doc. 131, p. 2. But these employees did not supervise Mr. Michaud, and Ms. Murguía does not contend they reported such information.

### 4.  The August 26, 2020 SAVE Search

Ms. Murguía also argues that the SAVE immigration check substantiates her claim of discriminatory intent. Per DWS policy, staff should run the SAVE verification when a claim is first filed. *See* Doc. 52, p. 162. But, Ms. Kelly testified, due to COVID-19, there was a lag in doing so and that may explain why Mr. Michaud ran a SAVE check on Ms. Murguía on August 26. *Id.* at p. 161. Mr. Jones also testified in his deposition that, at some point, he gave Mr. Michaud a box of SAVE verifications to run and instructed him to run them when he could. *See* Doc. 136-11, pp. 57–58.

DWS's evidence regarding the backlog is shaky. First, in a later deposition, Ms. Kelly testified that her knowledge about the SAVE search backlog stemmed from a conversation with a coworker in late March or early April 2020. *See* Doc. 136-15, p. 75. Ms. Kelly also admitted she was neither involved in running SAVE verifications nor had any personal knowledge of the backlog at any point, the co-worker who informed her of the backlog did not state how large it was or how long it might continue, and Ms. Kelly never saw any reports or documentation of the backlog. *See id.* at pp. 75–77. Mr. Jones cannot remember when he asked Mr. Michaud to help clear the backlog and similarly lacks any record of asking him to do so. *See* Doc. 136-11, pp. 57–58. Finally, of the four SAVE database searches Mr. Michaud ran on August 26, 2020, three of the four individuals—including Ms. Murguía—can be found on the sign-in sheet for that date. *See* Doc. 137-4*;* Doc. 131-3, pp. 84–87. That makes it seem unlikely Mr. Michaud was working through a backlog on that date.

It also appears that while Ms. Murguía's service file contained proof of residency and her immigration status was not in doubt, *see* Doc. 136-15, p. 81, it lacked an image demonstrating a prior search had been completed. According to Mr. Jones, during COVID-19, if the service file did not contain proof that the SAVE search had been completed, staff would assume it had not been. *See* Doc. 136-11, p. 61. Although, if this is what occurred, that does not explain why Mr. Michaud refused to scan Ms. Murguía's paystubs to her file.

The above facts go to pretext; they undermine Mr. Michaud's explanation for running the SAVE search. But the record does not indicate DWS knew that Mr. Michaud ran an unnecessary SAVE search, endorsed such a practice, or even tacitly approved of

it. Therefore, even if Mr. Michaud acted with discriminatory intent, Ms. Murguía has not shown DWS would be liable for those actions.

## IV.    CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment (Doc. 122) by Defendant Charisse Childers in her official capacity as Director of the Arkansas Division of Workforce Services ("ADWS" or "DWS") is **GRANTED;** the Motion for Summary Judgment by Plaintiff María Murguía (Doc. 128) is **DENIED**, and the Motion for Sanctions by Ms. Murguía (Doc. 97) is **DENIED.**

**IT IS SO ORDERED** on this 22nd day of July, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE